**EXHIBIT A: COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

☰ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**26CV02359**
**HENRY R. THOMPSON**
**MAR 20, 2026 05:15 PM**

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

**IN THE SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

BULLOCK LEGAL GROUP, LLC
and TINA BULLOCK,

     Plaintiffs,

v.

ARCHETYPE CAPITAL PARTNERS, LLC;
DOUGLAS MAYER; and
ANDREW SCHNEIDER,

     Defendants.

CIVIL ACTION FILE

NO.: _____

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Bullock Legal Group, LLC ("BLG") and Tina Bullock ("Ms. Bullock") (collectively, "Plaintiffs") file this Complaint for damages and injunctive relief against Defendants Archetype Capital Partners, LLC, ("Archetype"); Douglas Mayer ("Mayer"); and Andrew Schneider ("Schneider") (collectively, "Defendants"), stating as follows:

### INTRODUCTION

This case involves Defendants' willful and malicious theft of BLG's confidential and trade secret data compilation in order to extort Plaintiffs for millions of dollars. The theft was perpetrated by a conspiracy between Schneider – an attorney turned corporate mole who was at the time restricted from the full practice of law by the New Jersey Bar – at the behest of Archetype – a shadowy company incorporated in Nevada with no physical address – run by Mayer, a Texan who makes his living running extortion schemes through shell corporations.

Ms. Bullock is an attorney who works to bring justice to children and young adults victimized and led to addiction by video game developers seeking maximum profits. She met Schneider and Mayer through their company, Archetype, which purported to be a litigation finance company. While acting like a friend and colleague, Schneider used software loaded onto his

**General Civil and Domestic Relations Case Filing Information Form**

⧈ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**26CV02359**

HENRY R. THOMPSON
MAR 20, 2026 05:15 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

☑ Superior or ☐ State Court of <u>Cobb</u> County

| **For Clerk Use Only** | |
| --- | --- |
| Date Filed <u>03-20-2026</u> <br> **MM-DD-YYYY** | Case Number <u>26CV02359</u> |

## Plaintiff(s)

Bullock Legal Group, LLC

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |
| Bullock, Tina | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| | | | | |
| Last | First | Middle I. | Suffix | Prefix |

## Defendant(s)

Archetype Capital Partners, LLC

| Last | First | Middle I. | Suffix | Prefix |
| --- | --- | --- | --- | --- |
| Schneider, Andrew | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| Mayer, Douglas | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| | | | | |
| Last | First | Middle I. | Suffix | Prefix |

Plaintiff's Attorney <u>Boring, Charles</u>    Bar Number <u>065131</u>    Self-Represented ☐

### Check one case type and, if applicable, one sub-type in one box.

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contract
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☑ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____    _____
Case Number                        Case Number

☐ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____
Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____

_____

Version 1.1.20

**IN THE SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

⚖ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**26CV02359**

**HENRY R. THOMPSON**
**MAR 20, 2026 05:15 PM**

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

CIVIL ACTION NUMBER   26CV02359

Bullock Legal Group, LLC
Bullock, Tina

_____

**PLAINTIFF**

                                        **VS.**

Archetype Capital Partners, LLC
Schneider, Andrew
Mayer, Douglas

_____

**DEFENDANTS**

**SUMMONS**

TO: ARCHETYPE CAPITAL PARTNERS, LLC

        You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **Charles Boring**
> **Robbins Alloy Belinfante Littlefield LLC**
> **500 14th Street, NW**
> **Atlanta, Georgia 30318**
> **cboring@robbinsfirm.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

        If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 20th day of March, 2026.**

                        Clerk of Superior Court

                                        Connie Taylor, Clerk of Superior Court
                                        Cobb County, Georgia

SC-1                                                        Page 1 of 1
Rev'd 10/24

**IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA**

≡ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**26CV02359**

**HENRY R. THOMPSON**
**MAR 20, 2026 05:15 PM**

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

CIVIL ACTION NUMBER   26CV02359

Bullock Legal Group, LLC
Bullock, Tina

_____

**PLAINTIFF**

VS.

Archetype Capital Partners, LLC
Schneider, Andrew
Mayer, Douglas

_____

**DEFENDANTS**

**SUMMONS**

TO: SCHNEIDER, ANDREW

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **Charles Boring**
> **Robbins Alloy Belinfante Littlefield LLC**
> **500 14th Street, NW**
> **Atlanta, Georgia 30318**
> **cboring@robbinsfirm.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 20th day of March, 2026.**

Clerk of Superior Court

_____
Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

**IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA**

≜ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**26CV02359**

HENRY R. THOMPSON
MAR 20, 2026 05:15 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

CIVIL ACTION NUMBER  26CV02359

Bullock Legal Group, LLC
Bullock, Tina

_____

**PLAINTIFF**

                                    VS.

Archetype Capital Partners, LLC
Schneider, Andrew
Mayer, Douglas

_____

**DEFENDANTS**

**SUMMONS**

TO: MAYER, DOUGLAS

         You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

**Charles Boring**
**Robbins Alloy Belinfante Littlefield LLC**
**500 14th Street, NW**
**Atlanta, Georgia 30318**
**cboring@robbinsfirm.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

         If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 20th day of March, 2026.**

                        Clerk of Superior Court

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

SC-1                                                                              Page 1 of 1
Rev'd 10/24

computer to record private conversations, capture screenshots of proprietary information, and download and exfiltrate trade secret information for the benefit of himself, his partner, Mayer, and their fledgling company, Archetype.

Once the theft was accomplished, Defendants continued their heel turn and began to extort Plaintiffs through demands for millions of dollars and frivolous litigation. Now, Ms. Bullock and BLG seeks to justly and properly take back what is rightfully hers, restore her good name, and hold Defendants accountable for their nefarious and predatory deeds.

## JURISDICTION AND VENUE

1.

Plaintiff Bullock Legal Group is a law firm and limited liability company organized under the laws of the State of Georgia, with its principal place of business located at 3662 Cedarcrest Road, Suite 320, Acworth, Georgia.

2.

Plaintiff Tina Bullock is a licensed attorney and managing partner of Bullock Legal Group. She is a resident of the State of Georgia.

3.

Defendant Archetype Capital Partners, LLC is a limited liability company organized under the laws of the State of Nevada, with no identified principal place of business. Archetype can be served via its registered agent, Capitol Corporate Services, Inc., at 716 N. Carson St. #B, Carson City, Nevada.

4.

Defendant Douglas Mayer is the co-founder, manager, and CEO of Archetype and on information and belief resides at 19926 Hickory Wind Drive, Humble, TX 77346.

5.

Defendant Andrew Schneider is a licensed attorney in the State of New Jersey and co-founder of Archetype who, on information and belief, resides at 19433 Villa Mesa Drive, New Caney, Texas 77357.

6.

Defendants are subject to the jurisdiction of this Court pursuant to Georgia's Long Arm Statute, O.C.G.A. § 9-10-91, because they have committed tortious acts and tortious injuries within this State.

7.

This Court is a proper venue for this matter under O.C.G.A. § 9-10-93, because this is the County where the business was transacted and/or tortious conduct occurred and caused Plaintiffs harm.

**FACTS AND BACKGROUND**

8.

Ms. Bullock is a mother, attorney, and former nurse who has developed a passion and a thriving practice fighting for children and young adults who suffer from video game addiction ("VGA").

9.

Prior to becoming a member of the bar, Ms. Bullock was a registered nurse for 23 years.

10.

Even as a nurse, Ms. Bullock was heavily involved in litigation, gaining extensive experience proving medical injuries, economic valuation, and causation in connection with medical injuries underpinning both medical malpractice and mass tort actions.

-3-

11.

Along with a nursing degree and law degree, Ms. Bullock has an accounting degree with a minor in statistics.

12.

BLG, formerly known as Bullock Ward Mason, was founded by Ms. Bullock on August 11, 2022, in Cobb County, Georgia as a medical malpractice and mass tort law firm.

13.

In 2022, Ms. Bullock learned from her son that video game companies were recruiting from graduate school psychology classes in an effort to make their games as addictive as possible.

14.

Ms. Bullock had also personally experienced the effects of excessive video game play on her family and friends.

15.

Inspired to help families impacted by VGA, beginning in 2022, Ms. Bullock began researching theories of liability, injuries and hiring experts for video game addiction ("VGA") litigation.

16.

Ms. Bullock and BLG pioneered the concept of VGA lawsuits in the United States, filing the first such lawsuit on October 30, 2023.

17.

In advance of filing that first VGA lawsuit, BLG solicited numerous lenders to obtain funding to cover the firm's operating costs and BLG secured its first round of funding from a third-party lender in 2022.

18.

Because of the novelty and attention brought to BLG by the VGA litigation, BLG's caseload quickly began to grow.

19.

BLG began to seek additional litigation funding, a need that continued to grow as BLG's docket of cases across different case types continued to rapidly expand.

20.

In May 2024, Plaintiffs were introduced to Schneider and Archetype, a litigation funding brokerage service, who Plaintiffs were told could potentially assist Plaintiffs in securing additional litigation funding.

21.

Unbeknownst to Plaintiffs, at that time Archetype had only ever brokered a single litigation funding deal and lacked the experience necessary to secure the funding that Plaintiffs required.

22.

In furtherance of the potential relationship, BLG and Archetype executed a Non-Disclosure Agreement ("NDA") for the sole purpose of facilitating the sharing of BLG's confidential information in its request for brokerage services from Archetype.

23.

During the May 2024 introduction, Schneider declined Plaintiffs' request for brokerage services and told Ms. Bullock that he believed VGA litigation was too novel to secure funding.

24.

Plaintiffs almost immediately secured funding from other lenders without the brokering assistance of Archetype.

-5-

**BLG CONTRACTS WITH SIMPLYCONVERT AND BLUEKEY TEK
TO DEVELOP VGA MASS TORTS ANALYSIS**

25.

Based on her experience working on mass torts, Ms. Bullock understood the importance of monitoring other VGA litigation, tracking her own growing docket of cases, and synthesizing the data to support case valuations and damages calculations.

26.

As part of her efforts to track and synthesize this information, Ms. Bullock was introduced to SimplyConvert's Instant Case Evaluator on November 4, 2022.

27.

SimplyConvert is a company that assists law firms engaging in mass tort litigation with client relationship management, data management, referral platforms, automated client intake, client portals, and reporting analytics and insights.

28.

Ms. Bullock reached out to the owner of SimplyConvert in 2023 after seeing the data mapping SimplyConvert had built for litigation involving Camp LeJune to discuss building something similar for VGA.

29.

At the same time, BLG had been searching for a solution to obtain superior gamer tag information since the inception of its VGA practice.

30.

BlueKey Tek ("BlueKey") has developed technology to gather the most complete and accurate gamer statistics available on the market.

-6-

31.

BLG hired BlueKey to gather individual gamer statistics to determine whether that individual meets the causation requirements to qualify as a potential VGA plaintiff.

32.

BlueKey further provides an allocation of playing time for each individual, a list of games each individual played, and the corresponding company/defendant that created said game(s).

33.

BLG and BlueKey worked with Simply Convert to utilize and customize their platforms for BLG's VGA case needs.

34.

BLG executed an agreement with SimplyConnect to utilize its platforms for VGA cases on November 8, 2024.

35.

BLG also entered into a Services Contract with BlueKey with an effective date of December 2, 2024.

36.

As BLG's VGA practice continued to rapidly expand, BLG used the technology created by SimplyConvert and BlueKey to develop a statistical data set of VGA claims which, on information and belief, is the largest of its kind in the world (the "BLG Data Set").

37.

The BLG Data Set synthesizes millions of data points derived from the data of hundreds of thousands of VGA claimants – a unique set of data that is proprietary, secret, and invaluable to

BLG's ability to maintain its position as an industry leader in VGA litigation – which BLG considers and treats as trade secret information.

38.

Nobody outside of BLG is authorized to access the BLG Data Set.

39.

SimplyConvert and BlueKey are contractually obligated to keep the information contained in the BLG Data Set confidential and not disclose any data without BLG's express consent. *See* **Exhibits 1 and 2** attached hereto.

40.

BLG has taken necessary steps to maintain the secrecy of the BLG Data Set, including retaining a cybersecurity firm and using SOC-2 compliant case management software.

41.

The client data in the BLG Data Set – including client medical and school records – was crucial for the development of the damage model and workflows of VGA litigation.

42.

The sheer volume of case data from the BLG docket provided the modeling for epidemiologists hired by Bullock to provide expert testimony that the injuries suffered by BLG clients were specifically caused by VGA.

43.

As a result of her ever expanding VGA practice, Ms. Bullock has become a leading voice in the industry, speaking on multiple panels before plaintiffs' firms, being interviewed for Netflix documentaries, and appearing on Good Morning America on November 20, 2023.

44.

The BLG Data Set and Ms. Bullock's reputation have set Plaintiffs apart in the industry, and the integrity of both are a vital component of the continued success of BLG's VGA practice.

**DEFENDANTS' SCHEME TO INFILTRATE BLG**

45.

Unbeknownst to Plaintiffs at the time, Defendants had enacted a plot to obtain the BLG Data Set compiled and synthesized by Plaintiffs to offer the data for sale and eventually extort Plaintiffs for millions of dollars.

46.

On information and belief, Schneider and Mayer conspired to have Schneider offer to assist BLG as settlement co-counsel on VGA cases, and, after gaining access to BLG's data, secretly export the data and load the same to Archetype systems.

47.

In September 2024, Schneider approached Plaintiffs purporting to offer to serve as settlement co-counsel on VGA cases, falsely claiming that he was lead counsel in a prominent mass tort settlement, and that he was key in drafting the Master Settlement Agreement for that settlement.

48.

In connection with his offer, Schneider represented to BLG that he no longer was employed by or held an interest in Archetype.

49.

Needing additional assistance with its growing docket, and believing that Schneider was no longer associated with Archetype, BLG agreed to have Schneider serve as settlement co-counsel, entering into a joint venture agreement on September 27, 2024.

50.

Upon entering the agreement, Ms. Bullock offered Schneider a BLG laptop on which to conduct any BLG-related business; however, Schneider insisted on using his own personal laptop.

51.

Schneider knew that Bullock used a cybersecurity company to ensure that all BLG computers and laptops were secure, and at the direction of Meyer, Schneider refused to use a BLG-issued laptop, assuring BLG that his personal laptop was secure.

52.

Unbeknownst to Plaintiffs, Schneider had installed Hexanode and Teramind spyware on Archetype laptops, including Schneider's own laptop.

53.

Hexanode and Teramind allowed Archetype to record and collect keystrokes, intercept phone calls, and take videos of any party who used an Archetype computer or laptop.

54.

Without permission from BLG, Schneider began to record Zoom calls, phone calls, and emails with clients, opposing counsel, and vendors.

55.

Among other things, Schneider took from BLG systems:

- BLG strategy documents;

-10-

- Confidential drafts of BLG consolidated financial statements;

- Return-on-investment analyses;

- Pricing proposals;

- Litigation-specific information;

- Confidential and proprietary information concerning BLG's vendors;

- Confidential and proprietary information concerning BLG's law firm referral partners;

- Confidential and proprietary information concerning BLG's law firm past and present banking partners;

- Client lists;

- BLG and Tina Bullock's private personal data;

- Plaintiffs' compensation information;

- BLG's confidential attorney work product; and

- pending projects and proposals.

56.

Schneider also secretly exported BLG's data stored on SimplyConvert.

57.

Schneider took these steps at the direction of Mayer.

58.

Once exported, Schneider uploaded the stolen data to Archetype systems and worked with Mayer to give the false appearance that Defendants had developed the stolen data independently.

59.

On information and belief, Defendants had no expertise or access to client records to develop the dataset that Plaintiffs worked with SimplyConvert and BlueKey to compile and synthesize.

**DEFENDANTS' SCHEME TO EXTRACT MONEY FROM PLAINTIFFS**

60.

On February 18, 2025, Archetype sent BLG and Schneider a letter demanding they cease "the unauthorized use of Archetype's proprietary business models, financial methodologies, and litigation funding strategies by Bullock Legal Group ('BLG') and Mr. Schneider." *See* Exhibit 3 attached hereto.

61.

In the demand letter, Archetype admitted that it had accessed BLG's confidential client records, BLG's emails with third party vendors, and BLG financial information.

62.

Archetype demanded payment of $20 million, which Plaintiffs refused.

63.

On September 8, 2025, Archetype filed a Complaint in the United States District Court for the District of Nevada, naming BLG and Schneider as defendants, and demanding $100 million in damages. *Archetype Capital Partners, LLC v. Bullock Legal Group, LLC, et al.*, Case No. 2:25-cv-01686-GMN-BNW (D. Nev. 2025).

64.

On information and belief, Schneider was named as a defendant in order to maintain the secrecy of their scheme. *See* Exhibit 4 (Schneider Timeline admitting he is arguably still a 51%

-12-

shareholder in Archetype since the promissory note to redeem his shares were never paid to Schneider) attached hereto. In essence, Schneider sued himself to create the ruse that he is a defendant in Nevada.

65.

In tandem with the litigation, Archetype began a campaign to discredit and destroy Plaintiffs' reputations.

66.

Archetype contacted vendors and referring law firms in order to pressure them to stop working with Plaintiffs.

67.

Archetype also contacted the media and made false statements concerning Plaintiffs which have severely damaged the reputations of BLG and Ms. Bullock.

68.

Ultimately, BLG was dismissed as a defendant on December 5, 2025. However, the damage to Plaintiffs' reputation was already done.

69.

Plaintiffs are now threatened with the loss of current clients, referral partners, vendor relationships, income, and goodwill in amounts that may be impossible to determine.

70.

On information and belief, Defendants have made similar attempts to extort at least two other hedge funds with similar bogus claims, demanding identical payouts of $20 million from those firms.

-13-

71.

On information and belief, Defendants have secured third party litigation funding to bring this frivolous litigation against BLG and extort multiple hedge funds.

72.

On information and belief, Defendants have a pattern of securing third party litigation funding to support frivolous litigation, including previously soliciting offers from TRGP and/or Amicus to fund frivolous litigation against Contingency Capital.

73.

On information and belief, Archetype now operates under a business model to secure third party litigation funding to support frivolous litigation.

## COUNT I

**Violation of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 et seq.**

74.

Plaintiffs hereby re-allege and incorporate paragraphs 1 through 68 by reference.

75.

Plaintiffs have developed confidential information, including but not limited to:

- BLG's comprehensive data set maintained within SimplyConvert;

- BLG strategy documents;

- Confidential drafts of BLG consolidated financial statements;

- Return-on-investment analyses;

- Pricing proposals;

- Confidential and proprietary information concerning BLG's vendors;

-14-

- Confidential and proprietary information concerning BLG's law firm referral partners;

- Confidential and proprietary information concerning BLG's law firm past and present banking partners;

- Client lists; and

- Plaintiffs' compensation information.

76.

Plaintiffs derive actual and potential economic value from the information because it is not generally known to others and is not readily ascertainable by proper means by others, including its competitors, who would derive economic value from its use.

77.

Plaintiffs took reasonable steps to secure the confidentiality of this information.

78.

Plaintiffs' confidential information thus includes material that constitutes trade secrets under the Georgia Trade Secrets Act.

79.

Defendants acted without authorization and misappropriated Plaintiffs' trade secrets.

80.

Defendant's misappropriation of Plaintiffs' trade secrets was accomplished by theft and by taking advantage of the trust and confidence Plaintiffs placed in Schneider as settlement co-counsel.

81.

Defendants downloaded and stored Plaintiffs' confidential information and trade secrets from devices that have been used and kept in Georgia.

82.

Defendants were not authorized to acquire, retain, or use Plaintiffs' trade secrets, and their acquisition, retention, and use of the trade secrets was improper.

83.

Defendants used Plaintiffs' trade secrets for their own benefit without the express or implied consent of Plaintiffs, the owners of the trade secrets.

84.

Defendants' misappropriation and wrongful possession of Plaintiffs' trade secrets is ongoing and continuing.

85.

Plaintiffs have suffered compensable harm as a result of Defendants' misappropriation, including damage to Plaintiffs' business reputation, expenses incurred in investigating and prosecuting the theft of its trade secrets, and lost profits associated with lost clients and law firm referral sources.

86.

Defendants' misappropriation of Plaintiffs' trade secrets was willful and malicious, such that Plaintiffs is entitled to damages and attorney's fees.

## COUNT II

### Computer Theft, O.C.G.A. § 16-9-93 et seq.

87.

Plaintiffs hereby re-allege and incorporate paragraphs 1 through 81 by reference.

88.

In further of Defendants' scheme, Defendant Schneider accessed BLG's SimplyConvert database containing the BLG Data Set.

89.

Defendant Schneider's access was beyond the access he was authorized by BLG.

90.

Without authorization, Defendant Schneider took and misappropriated the proprietary BLG Data Set contained within BLG's SimplyConvert database.

91.

Plaintiffs have been injured by Schneider's unauthorized use of BLG's SimplyConvert database to take and misappropriate BLG's proprietary BLG Data Set.

92.

As a result, Plaintiffs are entitled to recover damages to be determined at trial and the costs of suit.

## COUNT III

### Violations of Georgia's Civil RICO Act

93.

Plaintiffs hereby re-allege and incorporate paragraphs 1 through 87 by reference.

94.

By undertaking the actions alleged in this Complaint, Defendants, and other unknown members of the conspiracy and criminal enterprise, committed, conspired to commit, and/or attempted to commit Theft of Trade Secrets, in violation of O.C.G.A. § 16-8-13.

95.

Defendant Schneider stole Plaintiffs' trade secrets, including:

- BLG's comprehensive data set maintained within SimplyConvert;

- BLG strategy documents;

- Confidential drafts of BLG consolidated financial statements;

- Return-on-investment analyses;

- Pricing proposals;

- Confidential and proprietary information concerning BLG's Vendors;

- Confidential and proprietary information concerning BLG's law firm referral partners;

- Confidential and proprietary information concerning BLG's law firm past and present banking partners;

- Client lists; and

- Plaintiffs' compensation information.

96.

This information is confidential, non-publicly accessible via proper means, and protected via various security measures implemented by BLG to ensure that their confidentiality is maintained.

-18-

97.

On information and belief, Defendant Schneider is directly or indirectly controlled by or acting in concert with the Defendants Mayer and Archetype.

98.

Defendants improperly used the same confidential files and trade secret information to attempt to extract $20 million from Plaintiffs, file a spurious lawsuit against Plaintiffs, and pressure vendors and referral sources to stop working with Plaintiffs.

99.

Through their coordinated efforts to steal Plaintiffs' trade secrets through a pattern of racketeering activity – the commission of the predicate acts described above – Defendants violated O.C.G.A. § 16-14-4(a).

100.

Defendants also violated O.C.G.A. § 16-14-4(c) by conspiring together to violate the RICO Act in order to steal from BLG.

101.

As alleged herein, Schneider, Mayer, and Archetype began this scheme to steal BLG's trade secrets.

102.

Evidence establishes that Defendants formed an enterprise in fact pursuant to O.C.G.A. § 16-14-3(3) and engaged in theft of trade secrets via the methods described above.

103.

Plaintiffs are entitled to remedial orders that prevent Defendants from continuing to engage in racketeering activity pursuant to O.C.G.A. §§ 16-14-6(a) and (b).

-19-

104.

Between 2024 and 2026, Defendants each participated in the aforementioned acts in furtherance of their enterprise as described herein.

105.

Plaintiffs are entitled to an award of actual damages, treble damages, punitive damages, and attorneys' fees against Defendants pursuant to O.C.G.A. § 16-14-6(c).

## COUNT IV

### Tortious Interference with Business Relations

106.

Plaintiffs hereby re-allege and incorporate paragraphs 1 through 100 by reference.

107.

BLG maintained business relationships with each vendor and referral source with which it worked on VGA litigation.

108.

BLG's vendors have been forced to secure counsel to advise them concerning Archetype's claim of ownership over the vendors' work product.

109.

Referral sources accounting for approximately 4,400 VGA cases ended their relationship with BLG on or before February 2, 2026.

110.

Defendants were strangers to the business relationship between Plaintiffs and their vendors and referral sources.

111.

Defendants acted improperly and without privilege when they contacted Plaintiffs' vendors and referral sources and pressured them to discontinue their business relationships with Plaintiffs.

112.

Defendants acted purposely and with malice with the intent to injure Plaintiffs as evidenced by Defendants' use of false information concerning Plaintiffs to pressure Plaintiffs' vendors and referral sources.

113.

Plaintiffs lost their ability to continue relationships with their vendors and referral sources due to Defendants' actions.

114.

Defendants' tortious interference with Plaintiffs' business relations has proximately caused damages to Plaintiffs in an amount to be determined at trial.

## COUNT VI

### Injunctive Relief

115.

Plaintiffs hereby re-allege and incorporate paragraphs 1 through 109 by reference.

116.

Plaintiffs seek a preliminary injunction to prohibit Defendants from using their confidential information which Defendants stole and from disseminating the confidential information to anyone, thereby maintaining the status quo, so that this case may proceed to discovery and a trial on the merits of Plaintiffs' claims described herein.

117.

Plaintiffs also seek permanent injunctive relief prohibiting Defendants from using their confidential information which Defendants stole and from disseminating the confidential information to anyone.

118.

Plaintiffs will suffer irreparable harm if an injunction does not issue. If Defendants continue to use and disseminate their confidential information, Plaintiffs will suffer grave financial injury, as Defendants seek to destroy Plaintiffs' relationships with vendors and referral sources and profit from the use of Plaintiffs' data.

119.

There is a substantial likelihood that Plaintiffs will succeed on the merits of their claims described herein.

120.

The balance of hardships favors the issuance of an injunction because Defendants do not stand to suffer any harm if an injunction issues: nothing currently prevents Defendants from using their own materials to conduct business. Plaintiffs, conversely, actively lose vendors, clients, and potential business while their proprietary and confidential information and trade secrets remain in the hands of Defendants.

121.

The public interest against theft and misappropriation of trade secrets and actual property of others supports the issuance of an injunction.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all triable issues.

-22-

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

(a)    Compensatory and exemplary damages in an amount to be determined at

trial;

(b)    Punitive damages in an amount to be determined at trial;

(c)    All costs and expenses, including attorneys' fees;

(d)    Injunctive relief requiring Defendants to return to Plaintiffs all documents,

communications, data, or any other confidential information in Defendants'

possession that belongs to Plaintiffs; and Such other relief as the Court shall

deem just and equitable under the facts and circumstances of this case.

Respectfully submitted, this 20th day of March, 2026.

*/s/ Charles P. Boring*
Charles P. Boring
Georgia Bar No. 065131
cboring@robbinsfirm.com
Daniel J. Monahan
Georgia Bar No. 231344
dmonahan@robbinsfirm.com
Rachel F. Gage
Georgia Bar No. 547982
rgage@robbinsfirm.com
Andrew Mason
amason@robbinsfirm.com
Georgia Bar No. 565613
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, GA  30318
Telephone:    (678) 701-9381
Facsimile:    (404) 856-3255

*Attorneys for Plaintiffs*

-23-

# Exhibit 1

# Video Game Addiction Data Hosting and Claimant Workup Services Agreement for Plaintiff Law Firms

This Agreement ("the **Agreement**") is by and between SimplyConvert LLC ("**SimplyConvert**"), and Bullock Legal Group ("**BLG**", and together with SimplyConvert the "**Parties**",) for the purpose of engaging SimplyConvert exclusively to host a platform and provide data & support services for BLG's Video Game Addiction client workup efforts in preparation of submitting claimants to defendants for settlement.

This Agreement shall become effective on the date (the "**Effective Date**") when the last party signs this Agreement (the "**Execution Date**") and will constitute a binding contract that will be enforceable by either Party in accordance with the terms herein, and together with the Settlement Administration Platform & Services Agreement for Video Game Addiction Mediation Settlements entered into by and between the parties with an Effective Date of December 30, 2024, hereby supersedes and fully replaces the prior Data Hosting and Services Agreement for Gaming Addiction Claimant & Settlement Administration Portal entered into by and between the Parties executed on November 23, 2024.

As of the Effective Date of this Agreement, the prior Data Hosting and Services Agreement for Gaming Addiction Claimant & Settlement Administration Portal executed by both Parties on November 23, 2024 is hereby terminated in its entirety and shall have no further force or effect.

## OVERVIEW of SERVICES

BLG has retained SimplyConvert to host its Video Game Addiction clients on the SimplyConvert platform which includes:
- a secure client engagement and document portal, with available app for download
- automated and bulk messaging capabilities
- the ability for BLG to obtain information from clients and enter direct updates of client information
- delivery of various reports including deficiencies & other analytic tools
- support services as needed, such as acquisition of gamer tags

SimplyConvert will make its API and CSV templates available to BLG, co-counsel and marketing partners to import additional Video Game Addiction-related cases and client data, and provide dashboard access to BLG, its co-counsel firms and marketing partners as requested by BLG in writing.

## REPRESENTATIONS AND WARRANTIES

a. SimplyConvert represents that it is SOC-2 compliant.

b. SimplyConvert represents that all data will be hosted by AWS, and accessible only by BLG and its designated users, using two-factor authentication.

c. SimplyConvert may only share data acquired under this Agreement as necessary to fulfill its obligations under this Agreement, which includes partners such as BlueKey Tek. SimplyConvert will not share data acquired under this Agreement with any other parties without obtaining the prior written authority of BLG.

## FEES

### Data Hosting and Services Fee

SimplyConvert charges a monthly Data Hosting and Services Fee of $14/client on a deferred basis ($12 non-deferred), and applies to all BLG clients hosted on the SimplyConvert platform.

The Data Hosting and Services Fee is applied for each client for each month in which that client is on the platform, whether for a partial or full month, for a period of no more than 12 months or until one of the following situations occurs:
1. All Deficiencies have been resolved and client has been submitted as such to the Defendant
2. The client has been closed out as not having a valid and qualifying claim

Any additional Data Hosting fees collected by SimplyConvert from Defense counsel on a monthly basis will be applied as a credit to BLG's Data Hosting Fees.

**BLG Monthly Funding Protection**
BLG agrees to pay SimplyConvert $150,000 on a monthly basis.

**Optional Outbound Follow Up Services and Fees**

BLG may request the assistance of SimplyConvert's Outbound Team to supplement automated and mass platform communications with live phone calls, texts, emails, and messages to follow up on and obtain completed Secondary Questionnaires or to obtain supporting documents and evidence to resolve deficiencies for specified clients.

Secondary Questionnaire: SimplyConvert charges $75 on a deferred basis for a completed questionnaire for the specified client(s)

Deficiency Resolution: SimplyConvert charges $30 on a deferred basis for obtaining from the client the necessary educational, medical, or economic documentation which satisfies and resolves the deficiency.

**BILLING & COLLECTIONS**

On the 15th of each month, SimplyConvert will provide an invoice reflecting the prior month's total clients subject to the Data Hosting and Services Fee, (and any charges for the Outbound Follow Up team, if applicable) at the deferred rate, with $150,000 due within 30 days.

Within 60 days of the settlement(s) being funded, BLG will be invoiced for and make payment to SimplyConvert for the total amount of accumulated deferred invoices for Data Hosting and Services (and any charges for Outbound Follow Up Team, if applicable) to date, net of the total accumulated monthly payments received by SimplyConvert of $150,000.

**ADDITIONAL TERMS**

1.  The Parties acknowledge and agree that in the course of performance under this Agreement, they may have access to certain confidential information belonging to each other, including but not limited to, evidence, work product, trade secrets, policies, procedures, operating manuals, utilization and quality assurance programs, software, marketing techniques, contractual arrangements, price lists, pricing policies, and other business and financial information (collectively, "Confidential Information"). The Parties shall maintain the confidentiality of all such Confidential Information and shall not divulge such information to any third parties, except as otherwise provided for under this Agreement and under law. The Parties shall take reasonable precautions against disclosure of any of the Confidential Information to unauthorized persons by any of its officers, directors, employees, or agents. Upon termination of this Agreement for any reason, the Parties shall cease all use of any of the Confidential Information and shall return to each other any copies thereof. The terms of this section shall survive the termination, expiration, non-renewal, or rescission of this Agreement

2.  In the event a dispute arises between the Parties regarding the performance of services or any other terms SimplyConvert shall not be liable for (i) any damages, including indirect, consequential, punitive, or special damages, regardless of whether any such damages were foreseeable or contemplated, unless such damages result from SimplyConvert's negligence or willful misconduct, as adjudicated by a court of competent jurisdiction.

3. Neither party may assign or delegate this Agreement or its rights or obligations under this Agreement without the prior written consent of the other party, whose consent shall not be unreasonably withheld or delayed.

4. SimplyConvert is authorized to act and shall not be liable for acting in reliance upon any judgment, order, instruction, notice, certification, demand, consent, authorization, receipt, power of attorney or other writing that SimplyConvert believes to be genuine and to have been signed, sent, or presented by the proper party or parties. SimplyConvert shall not be required to determine the authenticity or validity thereof, the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgment or order.  SimplyConvert may act in reliance upon any signature believed by it to be genuine and may assume that such person has been properly authorized to provide said signature.

5. Each party to this Agreement recognizes that, upon execution of this agreement, both parties are relying on the fulfillment and satisfaction of the purpose of this Agreement. Upon beginning work in furtherance of this agreement, SimplyConvert may take significant steps that are not included within the terms of this Agreement. Accordingly, SimplyConvert may rely upon the execution of this Agreement as an inducement to continue work in order to fulfill the purpose of this Agreement

6. There shall be no amendments or changes to this Agreement absent written consent from all parties.

7. This Agreement shall take effect on the date on which it is executed and will continue in effect until the purpose of this Agreement is satisfied by SimplyConvert. Agreement. This Agreement may be extended beyond the Term of Agreement by the written Agreement of the parties.

8. This Agreement shall be construed in accordance with and governed by the laws of the State of Georgia, without regard to conflicts of law.

9. This Agreement shall commence as of the Effective Date and shall continue in effect until the purpose of this Agreement is satisfied and complete.

10. BLG agrees the signatory below is authorized to bind BLG to this Agreement for services.

This Agreement may be executed in counterparts.

**For Bullock Legal Group:**

Document Ref: 5RV7I-ET8CF-ASN99-RMWSF

01 / 07 / 2025

Print Name:
Title:

**For SimplyConvert**:

01 / 07 / 2025

Jessica Hoerman
Chief Executive Officer

Document Ref: 5RV7I-ET8CF-ASN99-RMWSF

# Signature Certificate

Reference number: 5RV7I-ET8CF-ASN99-RMWSF

| Signer | Timestamp | Signature |
|---|---|---|

**Tina Bullock**
Email: tina@bullocklegalgroup.com
Shared via link

| | | |
|---|---|---|
| Sent: | 06 Jan 2025 23:24:22 UTC | |
| Viewed: | 06 Jan 2025 23:44:04 UTC | |
| Signed: | 07 Jan 2025 18:49:43 UTC | |

IP address: 161.193.1.228
Location: Miami, United States

**Jessie Hoerman**
Email: jess@simplyconvert.com
Shared via link

| | | |
|---|---|---|
| Sent: | 06 Jan 2025 23:24:22 UTC | |
| Viewed: | 07 Jan 2025 15:07:34 UTC | |
| Signed: | 07 Jan 2025 21:02:41 UTC | |

IP address: 99.10.85.107
Location: St Louis, United States

Document completed by all parties on:

07 Jan 2025 21:02:41 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 50,000+ companies worldwide.



# Exhibit 2

SERVICES CONTRACT
Gamer Tag Validation & Gamer Stats Retrieval

THIS SERVICES CONTRACT ("*Contract*") is made and entered into as of December 2, 2024 (the "*Effective Date*"), by and between BULLOCK LEGAL GROUP, LLC ("*Law Firm*"), and BLUEKEY TEK, LLC ("*Independent Contractor*").

*Recitals*

I.    Law Firm wishes to exclusively engage and contract with Independent Contractor to provide the Services set forth herein, and Independent Contractor wishes to accept such engagement, on the terms and conditions set forth herein.

For and in consideration of the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Law Firm and Independent Contractor agree as follows:

**1.    Services.**

(a)    Scope of Services.    Independent Contractor agrees to perform the services specifically described on Exhibit A (collectively, the "*Services*"), in accordance with this Contract. Upon notification to proceed, Independent Contractor shall perform the Services to completion in accordance with the requirements of this Contract.

(b)    Standard of Care.    Independent Contractor shall perform the Services consistent with the ordinary skill and care provided by contractors providing similar services in the same or similar locality under the same or similar circumstances. As between the Independent Contractor and the Law Firm, the Independent Contractor is solely responsible for the work, direction and compensation of its consultants, employees and any other party that Independent Contractor retains or for whom Independent Contractor is legally responsible.

**2.    Compensation and Payment.**

(a)    Compensation.    Independent Contractor's fees for the Services are set forth on Exhibit A attached hereto. Independent Contractor's compensation under this Contract shall be payable in installments in accordance with this Section 2. Additional services not expressly listed on Exhibit A ("*Additional Services*") requested by Law Firm will be invoiced on an hourly or lump sum basis as agreed upon by Law Firm and Independent Contractor or, at Independent Contractor's election, shall be subject to a separate agreement between Law Firm and Independent Contractor.

(b)    Payment Requests.    Independent Contractor shall submit to Law Firm periodic invoices (not more than twice per month) for the Services and any Additional Services rendered and any Reimbursable Expenses (defined below) incurred during any period after the Effective Date for which payment has not been made. Independent Contractor shall submit its invoices in

Page 1 of 8

such form and supported by such documentation (with regard to compensation for services as well as reimbursement of expenses and costs) as reasonably required by Law Firm to identify and verify the amounts requested for payment.

(c)    Payment by Law Firm.  Subject to the provisions of this Contract, payments are due and payable as outlined on Exhibit A.

(d)    Reimbursement and Additional Compensation.  Law Firm shall reimburse Independent Contractor for all reasonable expenses incurred by Independent Contractor in connection with the Services as outlined on Exhibit A ("*Reimbursable Expenses*"). All Reimbursable Expenses submitted to Law Firm will be accompanied by reasonable support documentation.

(e)    Change Orders.  Independent Contractor acknowledges and agrees that no alteration or addition to the Services performed hereunder will be the basis of an increase in the compensation paid to Independent Contractor or an extension of time to complete the Services unless and until such alteration or addition has been authorized by a change order signed by Law Firm and containing a description and cost of the change.

3.    **Progress Reports and Delays**.

Upon Law Firm's request, Independent Contractor shall submit to Law Firm a report setting forth the status of all current Services being performed. Each progress report shall describe any updates to expected timelines and due dates for completion of the Services hereunder. In addition to the foregoing, Independent Contractor will notify Law Firm of any events or circumstances that would reasonably be expected to delay or adversely impact the progress or completion of the Services and will provide Independent Contractor's recommendations to Law Firm for mitigating such impact or delay.

4.    **Indemnification**.

(a)    Indemnification by Independent Contractor.  Independent Contractor agrees indemnify and hold harmless Law Firm from and against all claims, damages, losses, and expenses, including, but not limited to, attorneys' fees in the defense of such claims or in connection with the enforcement of this indemnity obligation, arising out of or resulting from any negligent or intentional act or omission in violation of Independent Contractor's standard of care by the Independent Contractor or anyone directly or indirectly employed by the Independent Contractor, except to the extent caused by any  negligent or willful act or omission of Law Firm or anyone acting by, through or on behalf of Law Firm.

(b)    Indemnification by Law Firm.  Law Firm agrees indemnify and hold harmless Independent Contractor from and against all claims, damages, losses, and expenses, including, but not limited to, attorneys' fees in the defense of such claims or in connection with the enforcement of this indemnity obligation, arising out of or resulting from any negligent or intentional act or omission by Law Firm or anyone directly or indirectly employed by the Law Firm, except to the extent caused by any  negligent or willful act or omission of Independent Contractor or anyone

acting by, through or on behalf of Independent Contractor.

(c)    Under no circumstances shall any party be liable for consequential, exemplary or punitive damages or any lost profits under this Contract. Law Firm acknowledges and agrees that any liability of Independent Contractor shall be limited to the amount paid by Law Firm to Independent Contractor under this Contract.

(d)    The provisions of this Section 4 shall survive the termination of this Contract.

5.    **Licenses and Permits.**

Unless otherwise provided in this Contract, Law Firm shall be responsible for obtaining the licenses, authorizations and permits that Law Firm is required to have in relation to any hardware or software provided by Law Firm to Independent Contractor in connection with the Services. Law Firm shall have financial and administrative responsibility for the charges and taxes associated with such licenses, authorizations and permits.

6.    **Ownership.**

(a)    Work Product.  With respect to any Work Product developed by Independent Contractor, Independent Contractor shall own such Work Product and all Intellectual Property rights therein. "*Work Product*" shall mean all of the patents, patent applications, inventions, designs, mask works, processes, methodologies, copyrights and copyrightable works, trade secrets including confidential information, data, designs, manuals, training materials and documentation, formulas, knowledge of manufacturing processes, methods, prices, financial and accounting data, products and product specifications and all other intellectual property rights, as the foregoing terms are understood under United States law (collectively "*Intellectual Property*"), created, developed or prepared, documented and/or delivered by Independent Contractor, pursuant to the provision of the Services, including, but not limited to, all modifications or enhancements to Law Firm's existing systems and all manuals, training materials and documentation relating to the Services. Notwithstanding the foregoing, provided all applicable fees and other amounts have been timely paid by Law Firm to Independent Contractor, Law Firm shall have an irrevocable, nonexclusive, worldwide, paid-up license to use, execute, reproduce, display, perform, distribute copies of such Work Product internally within Law Firm's organization.

(b)    Law Firm Data.  All data and information submitted by or on behalf of Law Firm to Independent Contractor or otherwise in Independent Contractor's possession or accessible by Independent Contractor pursuant to provision of the Services ("*Law Firm Data*"), are and shall remain the property of Law Firm or applicable third parties. The Law Firm Data shall not be: (a) used by Independent Contractor other than in connection with providing the Services; (b) disclosed, sold, assigned, leased or otherwise provided to third parties or to anyone not having a specific need to know of the information for providing the Services, by Independent Contractor; or (c) commercially exploited by or on behalf of Independent Contractor.

(c)    Independent Contractor Data.  All data and information submitted by or on behalf of Independent Contractor to Law Firm or otherwise in Law Firm's possession or accessible by

Law Firm pursuant to provision of the Services ("***Independent Contractor Data***"), are and shall remain the property of Independent Contractor or applicable third parties. The Independent Contractor Data shall not be: (a) used by Law Firm other than in connection with providing the Services; (b) disclosed, sold, assigned, leased or otherwise provided to third parties or to anyone not having a specific need to know of the information for providing the Services, by Law Firm; or (c) commercially exploited by or on behalf of Law Firm.

7.    **Termination.**

(a)    <u>Termination by Law Firm for Cause</u>. This Contract may be terminated by Law Firm if Independent Contractor fails to perform its obligations under this Contract and fails to cure any such failure within thirty (30) days after the receipt of written notice thereof from Law Firm (or if failure is not correctable within such thirty (30) day period, if Independent Contractor has not commenced to correct such failure within said thirty (30) day period to the extent reasonably possible or does not thereafter diligently proceed to correct such failure).

8.    **Dispute Resolution and Attorneys' Fees.**

(a)    Law Firm and Independent Contractor shall first attempt in good faith to resolve any dispute or disagreement hereunder through informal negotiations. A dispute that has not been settled through informal negotiations within thirty (30) days shall be resolved in accordance with the dispute resolution provisions set forth on <u>Exhibit B</u> attached to and made a part of this Contract. All applicable statutes of limitation and defenses based on the passage of time shall be tolled while the procedures specified in this <u>Section 8</u> are pending. Independent Contractor shall continue to perform the Services provided herein notwithstanding the existence of any dispute or disagreement between the parties, provided that Law Firm has paid all undisputed amounts owed to Independent Contractor hereunder.

(b)    If any action at law or in equity, including an arbitration proceeding, is necessary to enforce or interpret the terms of this Contract, the court or the arbitrator, as applicable, shall determine the prevailing party and award to such prevailing party, in addition to any other relief to which such party is entitled to recover, its reasonable attorneys' fees, expert witness fees, costs, and other reasonable expenses incurred in such proceeding.

9.    **Compliance with Laws.**

(a)    Independent Contractor agrees to comply with all laws, rules, codes, regulations, decisions, opinions, orders, statutes, ordinances or restrictions promulgated by any branch of government, including without limitation, federal, state and local governments, that are now or may in the future during the term of this Contract become applicable to the Services.

(b)    Marketing agrees to comply with all laws, rules, codes, regulations, decisions, opinions, orders, statutes, ordinances or restrictions promulgated by any branch of government, including without limitation, federal, state and local governments, that are now or may in the future during the term of this Contract become applicable to the Services.

## 10.  Notices.

Except as expressly set forth to the contrary in this Contract, all notices, requests or consents provided for or permitted to be given under this Contract must be in writing and must be delivered to the recipient in person, by courier, by certified mail, or by email, or similar transmission. All notices, requests and consents to be sent to a party to this Contract must be sent to or made at the addresses, telecopy number and/or email address given for that party below or such other address, telecopy number or email address as that party may specify by notice to the other parties to this Contract. Whenever any notice is required to be given by law or this Contract, a written waiver thereof, signed by the party entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

If to Law Firm:              Bullock Legal Group, LLC

                             3350 Riverwood Parkway SE, Suite 1900
                             Atlanta, GA 30339

                             Attention:   Tina Bullock, Esq.
                             Telephone:   770-500-6205
                             E-Mail:      tina@bullocklegalgroup.com

If to Independent            BlueKey Tek, LLC
Contractor:

                             2926 Fontana Dr
                             Houston, TX 77043

                             Attention:   Dakota Fontenot
                             Telephone:   713-419-2966
                             E-Mail:      dakota@bluekeytek.com

## 11.  Governing Law.

This Contract shall be governed and construed according to the laws of the State of Texas without giving effect to conflict of laws principles.

## 12.  Severability.

If any provision of this Contract is invalid or unenforceable against any party or under certain circumstances, the applicability of such provision to other parties or circumstances shall not be affected thereby, and the remaining provisions of this Contract shall remain in full force and effect.

## 13.  Amendment, Modification and Waiver.

This Contract may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party

shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Contract shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

## 14.  No Third Party Beneficiaries.

This Contract is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other individual or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Contract.

## 15.  Further Assurances.

Following execution of this Contract, each party hereto shall, on demand of the other party, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out and give effect to the provisions and purposes of this Contract.

## 16.  Interpretation.

For purposes of this Contract, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Contract as a whole. Unless the context otherwise requires, references herein: (x) to Sections and Exhibits mean the Sections of, and Exhibits attached to, this Contract, (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof, and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Contract shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits or other attachments referred to herein shall be construed with, and as an integral part of, this Contract to the same extent as if they were set forth verbatim herein.

## 17.  Entire Agreement.

This Contract constitutes the sole and entire agreement of Law Firm and Independent Contractor with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the terms contained in the body of this Contract and those in the Exhibits and any other attachments hereto, the terms contained in the body of this Contract will control.

18.    **Counterparts.**

This Contract may be executed and delivered in any number of counterparts with the same effect as if all signatories had signed the same document.  Facsimile and other electronic copies of manually signed originals shall have the same effect as manually signed originals and shall be binding on the undersigned parties. Each counterpart shall be deemed an original, but all counterparts must be construed together to constitute one and the same instrument.

19.    **Exhibits.**

The following Exhibits are attached to this Contract and are incorporated fully herein, the same as if the terms and provisions therein were fully set forth in the body of this Contract:

|  |  |
|---|---|
| Exhibit A | Description of the Services and Compensation Schedule |
| Exhibit B | Dispute Resolution |

IN WITNESS WHEREOF, the parties have executed this Contract effective the day and year set forth above.

**LAW FIRM:**                    Bullock Legal Group, LLC

                                 *Tina Bullock*
By:    Tina Bullock (Jan 4, 2025 20:06 EST)
Name:    Tina Bullock, Esq.
Title:    Founding & Managing Partner


**INDEPENDENT CONTRACTOR:**     BlueKey Tek, LLC

                                 *Dakota Fontenot*
By:    Dakota Fontenot (Jan 4, 2025 18:51 CST)
Name:    Dakota Fontenot
Title:    COO & CIO

Page 8 of 8

# EXHIBIT A

## DESCRIPTION OF SERVICES AND COMPENSATION SCHEDULE

**SCOPE OF WORK**

**1) DATA VALIDATION & LEAD QUALIFICATION**

| Description | Total Amount | Payment Terms |
|---|---|---|
| Gamer tag validation, and gamer stats reporting per Gamer. | $80.00 / Gamer | Amounts due will be invoiced not more than biweekly and are due upon (a) any disbursement of attorney's fees related to Law Firm's VGA client's or claims, or (b) Law Firm's receipt of funding from any third-party lender post the effective date of this agreement. This cost may be reduced if a defendant shares the cost with Plaintiff firm which will be ratified by a contract addendum. |

**2) INTAKE INFORMATION COLLECTION SERVICES**

| Description | Total Amount | Payment Terms * |
|---|---|---|
| Intake information collection services shall consist of the following tasks:<br><br>1. Call center outreach to collect gamer tags and additional intake information (as specified by the Law Firm). | $30.00 / Gamer | Amounts due will be invoiced not more than biweekly and are due upon (a) any disbursement of attorney's fees related to Law Firm's VGA client's or claims, or (b) Law Firm's receipt of funding from any third-party lender post the effective date of this agreement. |

*\* Law Firm will not be charged for Intake Information Collection Services, as described above, for unsuccessful calls or incomplete intake information collection. Additional intake information Law Firm requests to be completed, other than collection of gamer tags, will be specified in writing by Law Firm and provided to Independent Contract in advance of the performance intake information collection services. Changes to the additional intake information to be collected will be specified in writing by Law Firm. Law Firm will provide Independent Contract with a minimum 48 hours notice of changes to the additional intake information to be collected. Changes will be impletemented by Independent Contractor no later than 48 hours after notice has been received and acknowledged, at which time changes will become effective and applied to incomplete or new intake information collection services. Changes to the additional intake information shall not apply to intake information collection that has been completed by Independent Contract prior to the time at which changes become effective.*

## EXHIBIT B

## DISPUTE RESOLUTION

(a)     If a dispute, controversy or claim arises between the parties, including without limitation any dispute, controversy or claim that arises out of or relates to this Contract or any other agreement or instrument between or among the parties to this Contract and/or any of the shareholders, officers, directors, managers, partners, members, agents, attorneys, representatives and contractors of any of the parties to this Contract (collectively the "parties"), or the breach, termination or invalidity of the Contract or any such other agreement or instrument, and including but not limited to a claim based on or arising out of a claim for tortious interference or other tortious or statutory claims arising before, during or after termination of the Contract (all of the foregoing shall be collectively referred to as "Dispute"), the parties agree to resolve the Dispute by binding arbitration administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules (the "Rules"), and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  Any arbitration hereunder shall be conducted pursuant to the Rules, except to the extent modified in this Section. The parties agree to attempt to resolve the dispute by mediation; provided that the mediation takes place on or before seven days after the dispute is first submitted to the AAA or such other time as is agreed in writing by the Law Firm and Independent Contractor. In the event the mediation does not take place as provided in the previous sentence, either party is entitled to pursue arbitration without being obligated to mediate the dispute.

(b)     The parties expressly agree that any court with jurisdiction may order the consolidation of any arbitrable dispute, controversy or claim under this Contract with any related arbitrable dispute, controversy or claim not arising under this Contract, as the court may deem necessary in the interests of justice or efficiency or on such other grounds as the court may deem appropriate.

(c)     The site of the arbitration shall be in Houston, Texas, and shall take place in the offices of the American Arbitration Association or such other place as the parties may agree.

(d)     The parties agree that the federal and state courts located in the State of Texas shall have exclusive jurisdiction over an action brought to enforce the rights and obligations created in or arising from this agreement to arbitrate, and each of the parties hereto irrevocably submits to the jurisdiction of said courts.  Notwithstanding the above, application may be made by a party to any court of competent jurisdiction wherever situated for enforcement of any judgment and the entry of whatever orders are necessary for such enforcement.

(e)     Process in any action arising out of or relating to this Contract may be served on any party to the Contract anywhere in the world by delivery in person or by registered or certified mail, return receipt requested.

(f)     Neither party nor the arbitrators may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

(g)     The parties agree that all questions concerning the arbitrator's jurisdiction shall be decided by the arbitrator.

(h)     Except as otherwise specified in the Contract, (i) all fees and expenses of the arbitration (exclusive of filing fees for claims and counterclaims) shall be borne by the parties equally, and (ii) each party shall bear the expense of its own counsel, experts, witnesses, and presentation of proofs.

(i)     This agreement to arbitrate is intended to be binding upon the signatories hereto, their principals, successors, assigns, subsidiaries or affiliates.

(j)     The arbitrator shall determine the rights and obligations of the parties according to applicable federal laws and the substantive laws of the state of Texas without giving effect to conflicts of laws principles.

(k)     The arbitrator is directed to consider any defense that all or part of the claim is not timely by reason of laches or statute of limitations as a preliminary issue and to render an award determining the merits of such claim before considering the substantive merits of the arbitration claim, unless the arbitrator determines that the merits of such claim of laches or statute of limitations is so intertwined with the substantive merits of the arbitration claim as to make impractical the determination of the claim of laches or limitations as a preliminary matter.

(l)     The arbitrator shall hear and determine any preliminary issue of law asserted by a party to be dispositive of any claim, in whole or part, in the manner of a court hearing a motion to dismiss for failure to state a claim or for summary judgment, pursuant to such terms and procedures as the arbitrator deems appropriate.

(m)     It is the intent of the parties that, barring extraordinary circumstances, any arbitration shall be concluded on or before six months of the date the statement of claim is received by the arbitrator. Unless the parties otherwise agree, once commenced, hearings shall be held five days a week, four weeks a month, with each hearing day to begin at 9:00 A.M. and to conclude at 5:00 P.M. These time limits can be extended or altered by an agreement by the parties or by a determination by the arbitrator that such extension or alteration is in the interests of justice. The arbitrator shall use his or her best efforts to issue the final award or awards within a period of thirty days after closure of the proceedings. Failure to do so shall not be a basis for challenging the award.

(n)     The procedure to be followed in any arbitration hereunder shall be as prescribed herein and in such directives that shall be issued by the arbitrator following consultation with the parties. Unless otherwise agreed by the parties, the procedures shall provide for the submission of briefs by the parties, the introduction of documents and the oral testimony of witnesses, cross-examination of witnesses, oral arguments, the closure of the

Exhibit B – Page 2 of 3

proceedings and such other matters as the arbitrator may deem appropriate. Further, the arbitrator shall regulate all matters relating to the conduct of the arbitration not otherwise provided for in this Contract or in the Rules.

(o)    In the event a party, having been given notice and opportunity, shall fail or shall refuse to appear or participate in an arbitration hereunder or in any stage thereof, the proceedings shall nevertheless be conducted to conclusion and final award. Any award rendered under such circumstances shall be as valid and enforceable as if both parties had appeared and participated fully at all stages.

(p)    The parties agree that discovery shall be limited and shall be handled expeditiously. Discovery procedures available in litigation before the courts shall not apply in an arbitration conducted pursuant to this agreement. However, each party shall produce relevant and non-privileged documents or copies thereof requested by the other parties within the time limits set and to the extent required by order of the arbitrator. All disputes regarding discovery shall be promptly resolved by the arbitrator.

(q)    It is the intent of the parties that the testimony of witnesses be subject to cross-examination. It is agreed that the direct testimony of a witness may be submitted by sworn affidavit, provided that such affiant be subject to cross-examination.

(r)    Strict rules of evidence shall not apply in an arbitration conducted pursuant to this Contract. The parties may offer such evidence as they desire and the arbitrator shall accept such evidence as the arbitrator deems relevant to the issues and accord it such weight as the arbitrator deems appropriate.

(s)    No witness or party may be required to waive any privilege recognized at law.

(t)    The parties to this Contract agree that neither party shall be entitled to any damages in the nature of punitive, exemplary or statutory damages in excess of compensatory damages or any form of damages in excess of compensatory damages, and the parties hereby waive all rights to any damages in the nature of punitive, exemplary or statutory damages. Any arbitrator or arbitrators deciding any disputes hereunder will not have the authority to award and are specifically divested of any power to award any damages in the nature of punitive, exemplary or statutory damages or any other damages in excess of compensatory damages or any form of damages in excess of compensatory damages, and may not, in any event, make any ruling, finding or award that does not conform to the terms and conditions of the Contract.

(u)    The parties agree that the arbitration requirement does not limit the right of any party to: (i) foreclose against personal property collateral; (ii) exercise self-help remedies relating to any personal property or proceeds such as setoff or repossession; (iii) employ any provisional remedies, judicial or otherwise for the purposes of realizing upon, preserving, protecting, or proceeding under forcible entry and detainer or similar remedies, or (iv) obtain provisional or ancillary remedies such as injunctive relief, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration.

# Bullock Legal Group & BlueKey Tek Service Agreement (e-sign)

Final Audit Report                                    2025-01-05

| | |
|---|---|
| Created: | 2025-01-05 |
| By: | Dakota Fontenot (dakotajamesfontenot@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAxjWnIaeilcSytDcgUnQZn7askAEpdkNn |

## "Bullock Legal Group & BlueKey Tek Service Agreement (e-sign)" History

📄 Document created by Dakota Fontenot (dakotajamesfontenot@gmail.com)
2025-01-05 - 0:45:10 AM GMT- IP address: 98.196.234.51

📧 Document emailed to Tina Bullock (tina@bullocklegalgroup.com) for signature
2025-01-05 - 0:45:14 AM GMT

📧 Document emailed to Dakota Fontenot (dakota@bluekeytek.com) for signature
2025-01-05 - 0:45:14 AM GMT

📄 Email viewed by Dakota Fontenot (dakota@bluekeytek.com)
2025-01-05 - 0:50:42 AM GMT- IP address: 104.47.118.254

✍ Document e-signed by Dakota Fontenot (dakota@bluekeytek.com)
Signature Date: 2025-01-05 - 0:51:21 AM GMT - Time Source: server- IP address: 174.202.225.255

📄 Email viewed by Tina Bullock (tina@bullocklegalgroup.com)
2025-01-05 - 1:05:51 AM GMT- IP address: 104.47.66.126

✍ Document e-signed by Tina Bullock (tina@bullocklegalgroup.com)
Signature Date: 2025-01-05 - 1:06:24 AM GMT - Time Source: server- IP address: 161.193.1.228

✅ Agreement completed.
2025-01-05 - 1:06:24 AM GMT

**Adobe Acrobat Sign**

# Exhibit 3

# FABIAN VANCOTT

**Kevin N. Anderson**
Attorney
Tel. 702.233.4444
Cel. 702.333.8861
kanderson@fabianvancott.com

February 18, 2025

***VIA CERTIFIED MAIL AND EMAIL***

Bullock Legal Group
*Attn:* Tina M. Bullock, Esq.
3350 Riverwood Parkway SE, Suite 1900
Atlanta, GA 30339
Tina@bullocklegalgroup.com

Andrew D. Schneider, Esq.
19433 Villa Mesa Drive
New Caney, TX 77357
aschneider@bullocklegalgroup.com

### Re: Unauthorized Use of Proprietary Information and Demand for Compensation

Dear Ms. Bullock and Mr. Schneider,

We write on behalf of our client, Archetype Capital Partners, LLC ("Archetype") regarding the serious and pressing matter of the unauthorized use of Archetype's proprietary business models, financial methodologies, and litigation funding strategies by Bullock Legal Group ("BLG") and Mr. Schneider.

Archetype values constructive dialogue and believes that an amicable resolution is in the best interest of all parties. At this stage, we are not asserting a formal demand but rather seeking to initiate discussions before considering more formal avenues.[1] Our goal is to address these concerns efficiently and fairly, avoiding the time, cost, and uncertainty associated with litigation.

To that end, we would like to explore a resolution regarding the financial benefits BLG has derived from the use of our proprietary models. Specifically, we seek to discuss appropriate compensation for origination fees tied to financing arrangements secured through our methodologies, retroactive licensing fees for continued use of our litigation finance structures, and a commitment to discontinue further use of our proprietary business strategies without fair compensation.

---

[1] We will pause to note the importance of preserving all relevant documents, communications, and electronically stored information (ESI), including emails, text messages, contracts, financial records, metadata, and any other materials relevant to this dispute. To ensure the availability of this information, we hereby request and put you on notice that routine deletion must be suspended, and all relevant records and storage systems, including personal devices used for business purposes, must be preserved. Courts take evidence preservation seriously, and failure to comply may have legal consequences.

Bullock Legal Group                                               Confidential
Andrew D. Schneider, Esq.
Re: Unauthorized Use of Archetype Proprietary Information
February 18, 2025
Page 2

## I. Professional Courtesy and Initial Assumption of Good Faith

Ms. Bullock, given the nature of the circumstances and as a professional courtesy, we are proceeding under the assumption that your firm was not fully aware of the manner in which this information was obtained. While we acknowledge the possibility that this assumption may not be correct, we choose to extend the benefit of the doubt in the spirit of professionalism and with the goal of reaching an amicable resolution before resorting to litigation.

## II. Unauthorized Use of Archetype Property – Cease and Return Demand

Pursuant to the Operating Agreement of Archetype and applicable provisions of the Nevada Revised Statutes, including but not limited to NRS 86.335, as well as applicable equitable principles, Archetype accepts the resignation, withdrawal, and voluntary surrender of membership interest tendered by Mr. Schneider. Additionally, his request to retain the company-issued laptop is denied, as it is Archetype property and must be returned. Mr. Schneider's resignation, withdrawal, and voluntary surrender constitute a breach of the Operating Agreement, resulting in the relinquishment of all rights and privileges associated with his membership interest in Archetype, including, but not limited to, any voting rights, profit distributions, and participation in the management of the company. As provided in the Operating Agreement and applicable law, remaining obligations, including non-disclosure, non-compete, and confidentiality provisions, remain in full force and effect to the extent permitted by law and the governing agreement.

Mr. Schneider, you are in possession of Archetype materials and information, including, but not limited to, electronic devices such as a laptop. Mr. Schneider, you have always been fully aware that the Archetype computer you are using, like all Archetype systems, is subject to monitoring. We have documented evidence that you continue to use the Archetype-issued laptop to conduct business on behalf of BLG and to compete with Archetype, including through the misappropriation and use of proprietary information. This ongoing use of Archetype property has provided direct evidence of unauthorized use and misappropriation of Archetype's proprietary business models, financial methodologies, and litigation funding strategies. Our forensic investigation has documented specific instances of misappropriation resulting in quantifiable damages.

We hereby instruct you to return all company equipment, property, and information, and to immediately cease any tortious, violating, infringing or otherwise unlawful conduct. To the extent of our ability and authority, we have remotely secured company equipment and information in your possession. Additionally, we hereby specifically direct you to refrain from unauthorized use of company property, competing with Archetype, disclosing any proprietary information, or engaging in any further violations or otherwise unlawful conduct.

## III. Breach of NDA and Unauthorized Disclosures

Archetype has invested substantial time, effort, and financial resources into developing proprietary litigation finance models, valuation methodologies, and case intake workflows, all of *which have*

## FABIAN VANCOTT                                   ATTORNEYS AT LAW

411 E Bonneville Ave., Suite 440                   www.fabianvancott.com
Las Vegas, NV 89101

Bullock Legal Group                                                          Confidential
Andrew D. Schneider, Esq.
Re: Unauthorized Use of Archetype Proprietary Information
February 18, 2025
Page 3

been fundamental to our company's competitive success in the industry. These trade secrets were created through years of research, industry experience, and significant financial expenditures, and they remain vital to our ongoing operations and market position. Their misappropriation has caused substantial harm to our business, and we have gathered extensive evidence demonstrating the direct link between the unauthorized use of our intellectual property and BLG's financial and business gains.

What makes this situation particularly egregious is that these actions occurred in direct violation of a Non-Disclosure Agreement ("NDA") executed between BLG and Archetype in May 2024. Under this NDA, BLG explicitly acknowledged its obligations to protect Archetype's confidential information and trade secrets. For approximately six months, BLG worked closely with Archetype, including direct collaboration with Mr. Schneider in his capacity as an Archetype partner, during which time BLG had full knowledge of Mr. Schneider's position and fiduciary obligations to Archetype.

During this period, Archetype actively performed services for BLG, successfully securing an additional $400,000 in funding from BLG's existing lender. Furthermore, prior to Mr. Schneider's attempted resignation at the end of December 2024, Archetype had successfully leveraged its network of funders to secure multiple term sheets for BLG. These concrete achievements came alongside ongoing discussions about Archetype servicing BLG's VGA claims and providing lead acquisition services. All of these interactions and negotiations were extensively documented through text messages, emails, and video recordings. Throughout this period of active collaboration, BLG had direct access to and knowledge of Archetype's proprietary methodologies and trade secrets, which were shared under the explicit protection of the NDA and were instrumental in securing these financial arrangements.

The issue is particularly concerning given BLG's explicit knowledge of Mr. Schneider's role as an Archetype partner and their clear obligations under the NDA to protect all of Archetype's confidential information. Despite these obligations, BLG proceeded to work directly with Mr. Schneider, bypassing its commitments to Archetype, to disseminate Archetype's proprietary information to multiple funding entities that had never been clients of Archetype nor were under any NDA with our firm. Specifically, BLG facilitated the distribution of Archetype's confidential investment memoranda and other proprietary materials to Calumet Capital, D.E. Shaw, Council Financial, LITF Holdings, and Esquire Bank, among others. This unauthorized sharing of Archetype's trade secrets with these third-party funders represents clear and irrefutable breaches of the NDA.

BLG's handling of this matter raises serious concerns about professional responsibility and due diligence. As a law firm bound by an NDA and other obligations, it had a duty to safeguard Archetype's confidential information.

**FABIAN VANCOTT**                                          ATTORNEYS AT LAW

411 E Bonneville Ave., Suite 440                            www.fabianvancott.com
Las Vegas, NV 89101

Bullock Legal Group
Andrew D. Schneider, Esq.
Re: Unauthorized Use of Archetype Proprietary Information
February 18, 2025
Page 4

Confidential

However, critical precautions such as verifying Mr. Schneider's standing with Archetype, confirming ownership and authorized use of the intellectual property, and ensuring that Mr. Schneider was not using an Archetype-monitored computer—were overlooked. At this time, our preference is to resolve this matter through productive discussions that acknowledge the issues at hand, mitigate ongoing harm, and fairly compensate Archetype for the unauthorized use of its proprietary information. However, should an acceptable resolution not be reached in a timely manner, we will have no choice but to pursue all legal remedies available to us.

## IV. Unauthorized Conduct and Requested Action

This situation also arises from the actions of Mr. Schneider, a former partner of Archetype, who was contractually bound to protect the company's proprietary financial models, litigation finance methodologies, and strategic processes. While still under legal and contractual obligations to Archetype, Mr. Schneider systematically extracted and transferred these trade secrets to BLG. Mr. Schneider had direct and continued access to Archetype's valuation frameworks, underwriting methodologies, and litigation funding structures, all of which were developed over years of effort and subject to strict confidentiality agreements.

Despite these legal protections, Mr. Schneider engaged in a pattern of conduct that resulted in BLG incorporating these proprietary models into its operations. This, in turn, enabled BLG to secure significant financial arrangements, including, but not limited to a $20 million financing with Calumet Capital, an additional $400,000 secured through Ben Blank & Co., and various other funding commitments predicated on our proprietary methodologies. These financing arrangements were built on the foundation of Archetype's proprietary business models, financial methodologies, and litigation funding strategies, including valuation processes, which were improperly obtained and used without compensation or authorization.

The misappropriation of trade secrets—whether intentional or not—is a serious legal matter that carries substantial consequences. Under both the Federal Defend Trade Secrets Act (DTSA) and the Nevada Uniform Trade Secrets Act (NUTSA), liability for misappropriation exists regardless of whether the recipient of the trade secrets was fully aware of their improper acquisition. Courts have consistently ruled that a party who benefits from misappropriated intellectual property must provide restitution to the rightful owner, and damages in such cases often include not only actual financial losses but also disgorgement of unjust enrichment and, in certain circumstances, punitive damages.

It is now indisputable that BLG has derived substantial financial benefit from Archetype's proprietary materials. Accordingly, we expect that appropriate corrective measures will be taken to remedy this situation in a fair and timely manner.

Bullock Legal Group
Andrew D. Schneider, Esq.
Re: Unauthorized Use of Archetype Proprietary Information
February 18, 2025
Page 5

Confidential

## V. Business Interference and Fiduciary Breaches

Beyond the misappropriation of trade secrets, BLG's use of Archetype's proprietary methodologies has also resulted in the disruption of key business relationships that Archetype had established with vendors, financial partners, and litigation funders. Many of these relationships were carefully built over time, with significant financial commitments, and were integral to our company's long-term strategy.

We have reason to believe that BLG's engagements with certain third parties—including funders, vendors, and co-counsel firms—may have interfered with contractual arrangements Archetype had in place. This has resulted in the loss of revenue streams, disrupted partnerships, and overall weakening of Archetype's position in the litigation finance market. Regardless of whether these actions were taken with full knowledge of Archetype's pre-existing relationships, the financial consequences remain substantial and must be addressed.

Additionally, as a (then) 19% owner of Archetype, Mr. Schneider's role in facilitating these transactions while still bound by legal and contractual obligations to Archetype raises serious legal concerns. These include the provisions of Section X of the Operating Agreement, which impose strict duties on members to protect the Archetype's confidential information, avoid competition, and refrain from actions that could harm the Company's business relationships and reputation.

Furthermore, Section X of the Operating Agreement explicitly states that all confidential and proprietary information of any kind relating to the Company, including intellectual property, financial data, trade secrets, marketing strategies, and all other materials developed by or for Archetype shall remain the sole property of the Company. This provision makes clear that any confidential information to which Mr. Schneider and BLG had access belonged exclusively to Archetype and could not be used for their own benefit or disclosed to any third party.

Yet the documentary evidence we have obtained—including internal communications, financial records, and forensic metadata tracking—demonstrates that he failed to uphold these obligations.

Courts have held that a company that benefits from a member's breach of duty, even if it did not actively participate in the breach, must still bear some responsibility for mitigating the resulting harm. BLG's financial gains from Mr. Schneider's breach of his duties make BLG liable for appropriate compensation to Archetype.

## VI. Data Security and Regulatory Risks

Another area of concern involves the potential unauthorized access to and distribution of sensitive claimant data, which may have exposed BLG to liability under HIPAA and other data protection laws. It appears that confidential client records were stored and utilized without adequate safeguards, which presents substantial compliance risks.

**FABIAN VANCOTT**

ATTORNEYS AT LAW

411 E Bonneville Ave., Suite 440
Las Vegas, NV 89101

www.fabianvancott.com

Bullock Legal Group                                                          Confidential
Andrew D. Schneider, Esq.
Re: Unauthorized Use of Archetype Proprietary Information
February 18, 2025
Page 6

Regulatory agencies, including the U.S. Department of Health and Human Services, take data breaches very seriously, and violations of HIPAA's data security provisions can result in significant financial penalties and reputational damage. Even if this exposure was inadvertent or negligent, it is in the best interest of all parties to address any potential compliance issues proactively rather than risk regulatory investigations and enforcement actions.

## VII. Financial Exposure and Proposal for Negotiation and Resolution

The financial impact of these issues on Archetype is considerable. Based on our calculations, the damages resulting from BLG's unauthorized use of Archetype's intellectual property exceeds $20,000,000.00. These damages include, but are not limited to:

- Lost revenue from diverted litigation finance opportunities (*see* **Exhibit A**);

- Licensing fees for the continued unauthorized use of Archetype's trade secrets for the 148,219 potential claims as of February 13, 2025 (*see* **Exhibit B**); and

- Compensation for BLG's unjust enrichment from proprietary methodologies.

Rather than pursuing costly and time-consuming litigation, Archetype is prepared to engage in good-faith negotiations to reach an equitable resolution. We believe that a settlement is in the best interest of all parties and would allow BLG and Mr. Schneider to address these concerns without the risk and uncertainty of legal proceedings.

To that end, we request immediate corrective action, including compensation for the financial benefits BLG has derived from the unauthorized use of our proprietary models. Specifically, we require payment of appropriate origination fees tied to the financing arrangements secured through our methodologies, retroactive licensing fees for continued use of our litigation finance structures, and a commitment to cease further use of Archetype's proprietary business strategies without fair compensation.

To move this process forward efficiently and avoid further escalation, we request the following: (1) acknowledgment of this letter within 24 hours to confirm your willingness to engage in discussions; (2) scheduling of a meeting within 48 hours to initiate negotiations; and (3) completion of an initial meeting within one week to explore a resolution.

If we do not receive a response, we will have no choice but to pursue all available legal remedies, including litigation to recover damages.

We remain open to discussing this matter further and trust that BLG and Mr. Schneider, as legal professionals, understand the importance of addressing this situation responsibly. We look forward to your prompt response.

Bullock Legal Group                                                    Confidential
Andrew D. Schneider, Esq.
Re: Unauthorized Use of Archetype Proprietary Information
February 18, 2025
Page 7

Please give me a call to discuss this matter. Again, thank you for your time.

                              Sincerely yours,

                              Kevin N. Anderson

**FABIAN VANCOTT**                                    ATTORNEYS AT LAW

411 E Bonneville Ave., Suite 440                      www.fabianvancott.com
Las Vegas, NV 89101

Confidential

## Exhibit A: Representative Sample of Financial Arrangements Using Archetype's IP

The following is a non-exhaustive list of opportunities usurped by Bullock Legal Group and Mr. Schneider.

**Lien Resolution & Settlement Administration:**
- LitPro Lien Resolution
- Milestone Settlement Administration
- Esquire Bank

**Marketing & Intake Groups:**
- SimplyConvert
- SF Smart LLC
- BlueKey Tek
- LegalFi (topclassactions.com)
- Stonehill Capital/Tom Young
- Opus Intake
- Rocket Intake
- Legal Mark
- FirstClass Intake

**Law Firms and Co-Counsels:**
- Shine Lawyers (Australian Law Firm)
- Andrew D. Schneider
- BLG
- The Crouch Firm
- The Law offices of James Vazquez
- Stanley Law
- The Law Offices of Bob Goldwater
- The Kugel Firm
- Keller Postman
- FYF Law
- Toer Hoermann Law
- Cooper Masterman
- Lawyers Helping People
- The Nielsen Firm
- The Dampier Law Firm PC
- Pintas Mullins
- Clear Frame Legal
- RDP Legal
- Martin Law
- Ventura Law
- Parker Waichman
- Parafinczuk Wolf
- D Miller & Associates

1

Confidential

- Legafi Law (topclassactions.com)
- Danzinger Dellano LLC
- The Johnson Firm
- William Mattar Law
- Carolyn St. Clair RN JD
- The Flanagan Firm
- Joel A. Nash Law PC
- The Nielsen Firm
- MacCloskey Kesler & Associates, LLC
- The Law offices of Nathaniel Broughty
- Van Law
- Joe Morris Law
- PILMMA (Kenneth Hardison)
- AVA Law
- DK Law
- Peagler Hollett (Turnbull Firm)
- Robert Woods
- Peterson
- Moody Law Firm
- Greg Leiter Law
- Stewart Guss
- DLL Law
- Nhan Nguyen
- Hilliard Law
- Wright Schulte
- Simmons and Fletcher
- Flynn Greathouse
- Onder Law
- Talabi Law/Miller
- Dolman Law Group
- Goldwater Law
- Stranch Jennings Garvey
- Andy Greene
- Attain Law
- Tor Hoermann
- Sterlington
- Palach
- Brandon Smith
- Levgold
- Damon Baldone
- Greg Jones
- Buchanan
- Childer Smith
- Darryl Isaacs
- Mark O'Mara
- Robert King

Confidential

- Phillips Legal
- Eric Mausner
- Bailey Cowan
- Weitz and Luxenberg
- Brent Coon
- Lawfty
- Montgomery Law Group

**Litigation Finance and Funding Groups:**
- Calumet Capital
- Ben Blank & Company
- BayPoint Advisors
- Contingency Capital Council Financial
- D.E. Shaw
- Western Alliance Bank
- Esquire Bank
- Law Finance Group
- Gard Family Office
- Greensledge
- GreensPoint Capital
- Kerberos
- Fortress
- Legalist
- Legis Finance
- LitFi
- One Williams Street
- Parabellum
- Pravati
- SYZ Capital Themis Fund
- TRGP

Rather than a comprehensive account at this stage, as proof of damages, the following Exhibits serve as a sampling of the numerous transactions in which BLG and Mr. Schneider have leveraged Archetype's intellectual property without authorization. As of February 15, 2025, these documented instances illustrate the substantial financial impact of BLG's and Mr. Schneider's actions:

1. 'Ben Blank Additional Funding: $400,000 (**Exhibit A1**)
2. Calumet Capital Term Sheet: $20,000,000 (**Exhibit A2,Exhibit A3 & Exhibit A4**)
3. Kerberos Term Sheet: $3,000,000 (**Exhibit A5 & Exhibit A6**)
4. Council Financial Proposal: $50 million (**Exhibit A7**)
5. Dampier: $500,000 (**Exhibit A8**)
6. Legis Finance: $1,000,000 (**Exhibit A9**)
7. D.E. Shaw: $25 million Facility (**Exhibit A10**)
8. Legalist Introductions for Cooper Masterman (**Exhibit A11**)
9. SimplyConvert Dashboard with Leads Generated and claims (**Exhibit B1**)

Confidential

**Exhibit A1**



Andrew Schneider <andrew@archetypecp.com>

**Fw: Bring Down Due Diligence Questions**
1 message

**Tina Bullock** <tina@bullocklegalgroup.com>                    Mon, Oct 21, 2024 at 6:21 PM
To: Andrew Schneider <andrew@archetypecp.com>

## TINA M. BULLOCK

CEO/Managing Partner

Direct 770-580-1983
Office 833-853-4258
3350 Riverwood Pkwy SE, Ste 1900, Atlanta, GA 30339
www.bullocklegalgroup.com



📆 Book time to meet with me

**From:** Jack H. Boyle <Jack@beblankco.com>
**Sent:** Monday, October 21, 2024 11:06 AM
**To:** Tina Bullock <tina@bullocklegalgroup.com>
**Cc:** David E. Childers <dave@beblankco.com>; Paul F. Bauknight <paul@beblankco.com>
**Subject:** Bring Down Due Diligence Questions

Hi Tina,

Our investment committee approved your request for a $400,000 increase to your existing loan amount today with the plan to fund an initial $150k once updated loan documents are completed.

Please note the only new terms with this transaction are that we will be charging a 5% amendment fee with the funding and also adding a requirement to the loan agreement for an assignment of a life insurance policy equal to at least 125% of the outstanding that will be required within 60 days of closing, but obviously if refinancing happens prior to the end of that timeframe it will not be needed.

We would still like to have a succession plan for Bullock Legal Group on file in the interim if you could please work on finalizing that. I will also get you an updated payoff amount by end of day today.

And in order to finalize the loan documents please answer YES/NO to the questions below with updated answers since **August 29, 2024 ONLY:**

https://mail.google.com/mail/u/0/?ik=5f381dd85d&view=pt&search=all&permthid=thread-f:1813567671651603406&simpl=msg-f:1813567671651603406          1/2

4

Confidential

## Exhibit A2

<div style="border: 1px solid;">

### ANNEX A
### NON-BINDING TERM SHEET

The following describes the proposed principal terms and conditions of the loan transaction described herein (the "Loan"). This Term Sheet is nonbinding except as expressly set forth herein, is subject to the completion of due diligence, tax review and investment committee approval satisfactory to Calumet, and does not summarize each of the terms, conditions, representations, warranties, covenants, and other provisions that will be contained in definitive legal agreements to be agreed upon by the parties after Lender's satisfactory completion of due diligence.

| | |
|---|---|
| Borrower | Bullock Legal Group |
| Lender | Calumet Capital LLC or one of its funds, affiliates, assignees or designees. |
| Portfolio | The Portfolio will consist of all cases in which Borrower have been or become retained or otherwise have a fee interest or other rights to proceeds as of or subsequent to the Closing Date, (i) that are or become eligible for payment ("Group A Cases"))*, and (ii) all additional cases in which Borrower have been previously retained or are subsequently retained while the Loan is outstanding (the "Group B Cases"), in each case subject to the priority of liens set forth under "Security" herein. |
| | Prior to Closing, the Lender will categorize Portfolio interests as Group A Cases (these cases are considered settled) or Group B Cases (these cases are considered unsettled), and such categorization will be incorporated as an exhibit to the Credit Agreement. |
| Net Fees | Attorney fees and case expense reimbursements received by Borrower including proceeds from any common benefit fund, net of referral fees, co-counsel fees due to other law firms, and compensation arrangements which have been previously disclosed to Lender in writing. |
| Security | Lender will receive a perfected, first-priority security interest in all assets of the Borrower including, without limitation the Net Fees of the Group A Cases and the Group B Cases. |
| Maturity Date | The 3-year anniversary of the Closing Date (the "Maturity Date"); provided, that Borrower may extend the Maturity Date from the 3-year anniversary (the "Initial Term") for an additional year (the "Extension") by furnishing sufficient notice to the Lender. |
| Total Facility Amount | $20 million |

---

* To be defined in the Credit Agreement.

</div>

5

Confidential

## Exhibit A3



Confidential

**Exhibit A4**



Confidential

**Exhibit A5**



8

Confidential

**Exhibit A6**



**KERBEROS**
CAPITAL MANAGEMENT

## TERM SHEET
### December 16, 2024

| | |
|---|---|
| **Funder** | Kerberos Capital Management LLC or a related entity. |
| **Borrower** | Andrew Schneider, Esq. |
| **Facility** | Term loan facility. |
| **Loan Amount** | $3,000,000. |
| **Funding Agreement** | A funding agreement between Funder, on the one hand, and Borrower, on the other hand, subject to conditions precedent to commencement of funding described below and containing other terms and conditions customary for investments of this nature. |
| **Term Length** | Term length is thirty-six (36) months from closing, subject to Borrower's option to extend term length by an additional twelve (12) months upon prior written notice to Funder. Term minimum is eighteen (18) months from closing. Borrower may prepay Loan without penalty at any time, subject only to Funder receiving the equivalent of eighteen (18) months minimum interest on the principal amount drawn. |
| **Interest** | Interest shall be payable in-kind and shall accrue daily, and compound quarterly, on all Outstanding Principal based on a 360-day year and shall be equal to 19.00%. |
| **Collateral & Security Interest** | First-priority security interest in Borrower's case portfolio (the "Collateral") |
| **Repayment** | One hundred percent (100%) of revenue from the Collateral payable to Funder until such time as all outstanding principal and interest owed by Borrower under the Funding Agreement are paid in full.<br><br>The performance of the Collateral does not impact Borrower's obligations under the Funding Agreement; Borrower will remain liable for repayment of principal and interest pursuant to the Funding Agreement even if the Collateral does not yield sufficient income necessary to satisfy Borrower's obligations under the Funding Agreement.<br><br>Borrower has the right to repay any additional amounts of principal and interest owed at any time without penalty, subject to the Term Length minimum |
| **Closing Costs** | 3% of the original principal amount of the Loan. Funder will deduct Closing Costs from the disbursement to Borrower upon closing. |

Page | 1

**Exhibit A7**

9

Confidential



10

Confidential

## Exhibit A8



11

Confidential

## Exhibit A9



Confidential

## Exhibit A10



13

Confidential

## Exhibit A11



14

Confidential

## Exhibit B - SimplyConvert Dashboard as of 2/7/2025

## Exhibit B1



# Exhibit 4

Two separate issues

1. Doug Mayer vs Andrew
   a. DM and ADS founded 2 companies together, ACP and ACG
      i. ACG does claims work
         1. ADS was bought out of ACG on 5.15.2023 in return for a 10% royalty on all claims from ADS's work product.
         2. Since 5.15.2023 DM has used the revenues from ACG to start additional companies. He has admitted to using the funds for other purposes, including personal distributions. He has not provided any accounting to ADS per the agreement. These distributions constitute embezzlement as they were unauthorized.
         3. ADS has no ownership interest in these other companies, named Green Oak Capital and One Ark.
         4. As of today, ACG has made $0 in payments or provided any accounting.
         5. The royalty owed to ADS by ACG is approximately $200k.
      ii. ACP was founded to engage in litigation finance.
         1. ADS and DM were 49/51 until 5.15.2023
         2. DM reduced ADS equity from 49% to 19% in return for a $250,000 promissory note. The note required ACP to make annual $50,000 payments on or before May 31 of each year.
            a. As of today, $0 of these payments have been made and the note is in default.
         3. ADS is a lawyer and DM is not. ADS built all the company's models to do valuation.
         4. June 2023 ACP had a joint venture with Contingency Capital to do tax credits and was negotiating a JVA with Contingency Capital to do litigation finance.
         5. July 2023 ADS developed a cashflow model that could accurately predict the future revenues of a law firm under specific circumstances. This was completed in one afternoon while visiting his in-laws.
      iii. What the model actually does and how it does it
         1. The model was built to accurately predict a law firm's future revenues for single event/personal injury practices by using historical data.

2. The requirements for it to work are as follows:
    a. The firm must be able to replace the cases that they settle with new cases. Mass torts have cutoff dates and there are a finite number of cases. PI cases are infinite as new MVAs happen every second of the day.
    b. The cases that the firm settles are representative of the cases that the firm can replace them with.
    c. The firm's current docket is large enough for statistics to work.
    d. The firm has a long enough track record and large enough sample size for statistics to work.
    e. The standard deviations are limited and never exceed the averages.
3. The steps to predict future revenue:
    a. Determine if the firm meets the requirements for the model to work. (stochastic, large sample size, standard deviation can't exceed averages)
    b. Count the number of cases open today
    c. Calculate the average attorney's fee per settled case
    d. Calculate the net monthly growth or decrease in the size of the docket
    e. Calculate the average duration of the firm's cases.
    f. Calculate the percentage of the docket that is expected to settle monthly:

Ex. Today is January 1st. *The firm has 500 open case. The Firm has settled 250 cases during the last two years for an average fee of $10,000 per case. The Firm has been growing at a rate of 10 cases per month. The average case duration is 12 months. The percentage of the docket expected to settle is 5%. What is the expected revenue for the month of June, 6 months from now?*

- What is the number of cases open today? (500)
- What are the average attorneys' fees per settled case? ($10,000)
- What is the average growth of the docket net? (+10 cases)
- What is the average case duration? (12 months)
- What is the percentage of the docket expected to settle monthly? (5%)
- What is the number of cases open in 6 months? (500 cases + 6 months X 10) = 560
- What is the number of cases open 12 months earlier? (560 – 12 months X 10) = 440
- What is the number of case expected to settle in June? (440 X 5%) = 22 cases
- What is the expected revenue in 6 months? (22 cases settled X $10k per case) = $220k

ACP showed the model to Contingency Capital in furtherance of the proposed venture.

1. Contingency Capital stole the model and admitted to using it on a deal outside of ACP.
2. Doug refused to accept that the model was designed for only one purpose.
3. DM claimed that Contingency Capital had raised billions of dollars using this model. David Hecht of Hecht Partners dropped the case. DM was unable to obtain litigation funding for the case. DM had a backer named Joey Rosati provide a letter of credit to counsel that was specifically not allowed to be used for the case. DM claimed the following things to be proprietary to ACP and that Contingency had stolen all of them.
   a. Contingency Capital has never had a model to value PI cases.
   b. Contingency Capital has never financed a firm with single event cases before ACP's model from July 2023.
   c. Contingency Capital has never financed a firm with a combined PI and mass tort docket.
   d. Contingency Capital has never had an evergreen or all-asset senior secured loan based on current and future cases fees.
   e. Contingency Capital has never used different waterfall percentages for mass torts and PI cases
   f. Contingency Capital had never done a loan to a PI firm of $30 million or more
   g. Contingency Capital had never done a loan with an accordion provision that allowed the borrower to upsize the loan based on additional collateral.
   h. Contingency Capital had never used a third-party valuation agent to do the valuation of the collateral and the servicing.
   i. Contingency Capital had never relied upon historical data to do valuation. (They do actually call the model "Andrew's determinative cashflow methodology).
4. ACP hired David Hecht to sue Contingency Capital. Hecht dropped the case when the damages became had to prove.
5. ACP hired Adam Oppenheim to file the case. Adam would not file the case without proof of funds or external litigation finance

due to damage concerns. Doug believed it was a $250 million case.

6. Adam had not filed the case more than one year after being retained. He had not found proof of use to confirm harm or use of proprietary information.

g. 4.30.2024 – Adam Oppenheim is retained as counsel for ACP against Contingency Capital.

   i. TRGP passed on funding
   ii. 5.7.2024- GLS introduction. Passed on funding.
   iii. 5.22.2024- DM told JF to find him brokers to fund case against CC.
   iv. 5.22.2024- Jaime Rand is considered
   v. 5.22.2024- Amicus is considered
   vi. 6.11.2024- TRGP made soft offer, no term sheet.

h. 5.22.2024 – BLG and ACP sign a mutual NDA

i. 9.27.2024- ADS signs a JVA with BLG to act as settlement counsel in the Video Game Addiction Litigation.

j. 10.11.2024- BLG receives a proposal from SC, Milestone, and LitPro.

k. 10.24.2024 – BLG receives and accepts a proposal to use Simply Convert as the CRM and claim portal, Milestone as the Settlement Administrator, and LitPro as the lien resolution company.

l. 11.8.2024- BLG signs the agreement with SC, Milestone, and LitPro

m. 11.14.2024- ADS attends mediation with BLG in Philadelphia

n. 12.18.2024- ADS and Light Townsend have a call at noon while ADS is driving to lunch to meet with Danzinger Dellanno.

   i. Light asks how the litigation is going and ADS tells him great. When asked if there will be any work for ACG to do, ADS tells him no. ADS tells him that BLG has signed an exclusive to use Simply Convert as the claims portal, Milestone as the Settlement Administrator, and LitPro to resolve liens.

o. 12.18.2024- DM texts ADS, *"No on the monitor. I am getting all of the tech stuff back and trying to sell it. We have no money and I need to find a way to pay bills. I'm calling back everyone's laptop including Cory's next week and any other tech I have out there to try and sell as a bundle."*

   i. ADS, *"That doesn't include me correct"?*
   ii. DM, *"You can keep your laptop along with Light, but I'm going to call everyone else's back."*

p. 12.20.2024 – ADS has dinner with Darren Miller and finds out he is financed by Contingency Capital. ADS asks for details and has a copy of the

documents on his laptop. Prior to the meeting ADS thought Darren Miller was financed by Kerberos. DM's prior allegations made in the letter of demand:

<u>Claims DM made against Contingency that ADS found to be false after speaking with Darren Miller:</u>

- Contingency Capital has never had a model to value PI cases.
  - The Compliance Certificate includes a calculation for Eligible Cases that include PI fees
- Contingency Capital has never financed a firm with single event cases before ACP's model from July 2023.
  - The loan originated on 7.15.2020
- Contingency Capital has never financed a firm with a combined PI and mass tort docket.
  - The loan has personal injury (PI) and mass tort collateral
- Contingency Capital has never had an evergreen or all-asset senior secured loan based on current and future cases fees.
  - The loan is evergreen and has a senior-secured all asset lien on current and future case fees
- Contingency Capital has never used different waterfall percentages for mass torts and PI cases
  - The loan has different waterfall percentages for PI and mass tort cases
- Contingency Capital had never originated a loan to a PI firm of $30 million or more
  - The loan had a principal amount of $30 million
- Contingency Capital had never done a loan with an accordion provision that allowed the borrower to upsize the loan based on additional collateral.
  - The loan had its first upsize (accordion) on 12.23.2021
  - The loan had its second upsize on 9.22.2022
  - The loan had its third upsize on 8.18.2023
- Contingency Capital had never used a third-party valuation agent to do the valuation of the collateral and the servicing.
  - The loan provided for a third-party administrative agent to do a "projected fee calculation"
- Contingency Capital had never relied upon historical data to do valuation. (They do call the model "Andrew's determinative cashflow methodology").

q. 12.20.2024- the above facts triggered me to call Karla Cruel as ethics counsel.

r. Darren Miller's loan disproved all of the allegations against Contingency Capital except one. (Andrew's determinative cashflow methodology).

s. ADS called Doug Mayer to tell him that I had already spoken with my ethics counsel, that I had firsthand knowledge of materially adverse information to ACP's claim against Contingency Capital.

t. Doug Mayer asked what the pending litigation would be worth if the rest of it was already used and was told less than $5 million. The other allegations were patently false and this couldn't be filed.

u. DM told ADS to shut the fuck up and that it was his decision as managing partner. He wanted me to draft a report of what "I might have found" so he could decide how to tell Adam Oppenheim, or if he needed to.

v. DM texts ADS, "*I wish you had more control and this is why I stated take time to think about it and we will talk Monday. As I said on our call, no one is to talk to Adam until discussions are had and I will contact him.*"

w. ADS called ethics counsel again. We agreed that this is why rule 3.1 and 3.3 exist.

x. 12.21.2024- ADS notified DM that it wasn't his decision whether I would follow my PR requirements and as a non-lawyer, his instruction to do so is not something I'm willing to accept.

y. 12.22.2024- ADS notified Adam Oppenheim by email of the issues with ACP's claims against Contingency Capital and told him that I'm resigning.

z. 12.22.2024-ADS emails DM and JF to notify both of them of my resignation. I state that I will give DM my 19% equity in ACP for $0 and my laptop. I have privileged information on my laptop (DM got the domain name for adsesqlaw.com and is aware of privileged info). At this time, ADS has a promissory note from ACP with a $250k principal amount that has been defaulted, as well as a royalty payment from ACG that has never been paid. The value of the two is exponentially more than a laptop.

aa. 12.23.2024- ADS emails the NJ Bar to comply with stipulations relating to any job changes.

bb. 12.24.2024- ADS has one open litigation finance deal for ACP with Legalist. Jeremy Gillick of Legalist asked me if I was still with ACP because the borrowers had requested that I finish the transaction.

    i. ADS responded, "*I'm finishing this off for James because I can't leave something unfinished. Archetype will still be paid.*"

      ii.   2.28.2025- James confirmed that they had paid ACP for the transaction and that I was doing this for free. I will not take a penny for this.

      iii.  2.28.2025- Legalist confirmed that ACP will be paid when then second part of the transaction closes. ADS will not be paid.

cc. 12.31.2024- ADS and ACP's lawyer Jon Friedland of Much Shellist have a call.

      i.   Jon tells ADS he isn't sure that he can resign.

      ii.  ADS tells Jon that Doug telling him to shut the fuck up about his ethics means that the partnership is over. There is no world I come back and have my license risked.

      iii.  Jon asks if ADS will cooperate with the lawsuit against Contingency anyway and tries to persuade ADS that the docs he saw weren't the basis of the lawsuit.

      iv.  ADS tells Jon he will absolutely cooperate and testify truthfully. I built the model that Doug has blown out of proportion in a matter of hours at my in-laws. The only reason it is impressive is because people are dumb, but it is basic math. It didn't take years to build, and it doesn't work for anything that isn't based on probability with substitution. I also told him I'd testify about why I resigned when my former partner refused to let me make a required disclosure to counsel.

dd. 1.4.2025- ADS sends the ACG and ACP docs to Jon Friedland to notify him that the ACG buyout agreement is in default and the ACP promissory note is in default but I'm choosing to not take action. My laptop instead of hundreds of thousands of dollars. Both docs are attached.

ee. 1.6.2025- ADS emails Jon Friedland to notify him that I am not coming back. The email lays out that DM has embezzled funds from ACG, failed to provide an accounting, violated all forms of corporate protections, and risked my bar license by demanding I move forward with a lawsuit I know to be false.

ff.  2.18.2025- BLG and ADS receive a "non-demand" demand letter from Kevin Anderson. It makes claims that they know to be fundamentally false.

      i.   The claim that ACP has been "successful" in litigation finance is fundamentally false. I have done more than $250 million in litigation finance deals in my career. ACP has done a total of $2 million. The deal was consummated two months after my resignation.

      ii.  They reference the NDA from 5.22.2024, but ignore that it requires that they don't disclose, or threaten to disclose our proprietary information. It ignores that the "proprietary information" was found to be not proprietary, and outside counsel is aware of that.

iii. Archetype did not actively perform services to secure BLG an additional $400k in funding from BLG's existing lender. Tina emailed ADS to notify him that she had secured an additional $400k from her lender.

iv. ADS's resignation is called "*attempted.*" This means that their access to my laptop as a partner is under NDA. No data breach can be claimed without ACP purposely violating the NDA.

v. ADS's fiduciary obligations to ACP were upheld.

1. ADS didn't default and accelerate a $250k promissory note owed to him by ACP in furtherance of a clean break.

2. DM knowingly ignored the requirements to provide a formal accounting and pay ADS a royalty from ACG. No accounting was provided from March 2023-present. No monies have been paid to ADS under this agreement.

3. DM used this money to start two other companies, One-Arc and Green Oak. DM bragged to ADS about using the money for his children's Montessori. During this time, DM stopped paying ADS a salary from ACP and canceled ADS's health insurance for his family while keeping DM's own.

4. DM's breach of fiduciary obligations to ADS, as well as the ongoing embezzlement of funds in furtherance of a criminal conspiracy makes the claim of breach of fiduciary obligations bad faith, and ironic.

5. DM violated all corporate formalities by moving these moneys without providing an accounting exposing ADS to liability for his breaches of fiduciary obligations as a "managing partner."

6. These breaches of agreements by DM make the extortion attempt all the more egregious. His personal residence is not protected and has a UCC filing. ADS's laptop is less than the defaulted agreements and the reason DM still has a roof over his head.

vi. ACP is not in the business of providing lead generation services. ACP received a single campaign order for Visa/MC leads from one entity for $25k. It failed.

vii. ACP does not have a claim servicing business. DM wanted to start one but lack the staff and resources to do so. More importantly, the client's best interests made it impossible to use external vendors for claim workup.

    viii. DM wanted to submit a proposal and I'm not sure if it was ever submitted. DM explicitly told ADS that he was not included in the budget for any proposal and to negotiate his own agreement.

    ix. ADS did exactly what he was instructed to do. He negotiated an agreement to become settlement counsel. DM asked more than once if ADS was being paid by BLG and stated his happiness when he was told yes.

    x. This explicit instruction by DM makes this entire claim bad faith.

    xi. BLG declined all external vendors for claim workup.

    xii. ACP has never secured a term sheet for BLG for financing.

1. ADS has not disseminated anything that could be considered proprietary to any funder.
2. 10.13.2024- Calumet Capital emailed Tina directly about meeting in Las Vegas.  (ACP and ADS weren't in Las Vegas)
   a. Calumet procured the funder and performed all due diligence according to their protocols.
   b. Calumet handled all of the valuation methodologies
   c. ADS uploaded BLG's documents and prepared a budget. ADS also negotiated the loan documents in his capacity as a lawyer.
3. 12.1.2024 – Tina emailed ADS the term sheet from DE Shaw (LITF-Holdings) that she procured directly. ADS reviewed the term sheet and rejected it. Legal work.
4. 1.29.2025- Counsel Financial reached out to Tina directly on Linkedin to discuss an ABS arrangement. This would be an agreement for legal services between the parties and not financing.
5. 2.13.2025- Esquire Bank proposed a loan to Tina based on a QSF being deposited there. Unless ACP is able to negotiate a settlement I don't think ACP has any influence in this.

    xiii. BLG couldn't interfere with any relationships that it didn't know existed.

1. Vendors
   a. ACP has no pre-existing relationship with any vendor that BLG uses besides ADP.
2. Funders
   a. Contingency Capital? DM tried to extort them and that's why I resigned.

3. Co-counsel firms
    a. Do explain how a law firm engaged in a co-counsel arrangement with another law firm that ACP is not legally allowed to be a party can make this claim.
    b. Is ACP stating that it could be a member of one of these agreements?
4. BLG's interactions with vendors in the normal course of business have not disrupted any of ACP's relationships. More importantly, there is no duty. Let's go through each of these pre-existing relationships in detail.

xiv. Lien Resolution & Settlement Administration
1. Litpro Lien Resolution – We hired a vendor to perform services ACP is not capable of performing. We highly recommend the vendor and ACP should consider hiring them if they ever need these services.
2. Milestone Settlement Administration- ACP is not capable of performing these services. These include getting minor settlements approved under seal and QSF services. We highly recommend the vendor and ACP should consider hiring them if they ever need these services.
3. Esquire Bank – This is literally a chartered bank where funds are held. We highly recommend this vendor and ACP should consider thiring them if they ever need these services.

xv. Marketing & Intake Groups
1. Simply Convert – Isn't the marketing company. This is the exclusive CRM for BLG and all referring counsel.
2. Bluekey Tek- This is Tina's son Alan's company.
3. Stonehill Capital/Tom Young – Tom Young is a law firm. Stonehill Capital is an external funder that we do not control.
4. The other intake companies all have identical criteria and are required to put their intakes into Simply Convert.

xvi. Law Firms and Co-Counsels
1. Archetype is not a law firm. Doug Mayer is not a lawyer. It would be impossible to "usurp" a relationship that would be contractually illegal.
2. Andrew D. Schneider is listed here
3. BLG is listed here which is Bullock Legal Group
4. Parker Waichman had a JVA before ADS met BLG

     5. Tor Hoermann Law had a JVA before ADS met BLG

     6. Sterlington had a JVA before ADS met BLG

     7. Palach same

     8. Levgold Same

     9. Childer Smith same

xvii. <u>Litigation Finance and Funding Groups:</u>

     1. Calumet Capital – Tina met them in Vegas, not an ACP intro

     2. Ben Blank & Company -Tina's lender before she met ACP

     3. Baypoint Advisors- ABS under JVA for co-counsel

     4. Contingency Capital – Doug tried to extort them and the suit was dropped when ADS notified DM that his claims were bogus.

     5. Counsel Financial – Directly contacted Tina

     6. DE Shaw – Directly contacted Tina

     7. Western Alliance Bank – Discussed QSF services for attorneys

     8. Esquire Bank – Discussed QSF services for attorneys

     9. Law Finance Group – Tina got a term sheet from them directly, not an ACP intro

     10. Gard Family Office – reintroduced to ADS by Marc Stern for Simply Convert's funding.

     11. Greensledge – ADS has no record of contact

     12. Greenspoint Capital – Who is this? No record of contact

     13. Kerberos – ADS has a relationship with Kerberos from 2018. The only thing they are doing is his personal finances based on his own attorney's fees.

     14. Legalist- Paid ACP for ADS's work per the contract with Flynn.

     15. Legis Finance -Bullock has a relationship with Tom Stoughton from before ADS

     16. LitFi – This is a law firm

     17. One Williams Street- Friendly with Contingency and will never do business with Doug after he tried to extort them.

     18. Parabellum – Discussed VGA litigation overall

     19. Pravati- No contact

     20. SYZ Capital – brought by a broker for a law firm, no interactions of any kind.

     21. Themis Fund- Wrote themselves into a JVA, we told the law firm that it was illegal. Never actually spoke to them.

     22. TRGP – No contact

xviii.  Exhibits
1. Ben Blank Additional Funding $400,000 -As noted above, Tina emailed ADS to notify him that she had done this.
2. Calumet Capital Term Sheet $20,000,000- as noted above, Tina emailed ADS to notify him that she had gotten this.
3. Kerberos Term Sheet $3,000,000: ADS has a pre-existing relationship with Kerberos Capital Management before founding ACP. The term sheet is for ADS's own legal fees and personally guaranteed. No ACP IP could be used.
4. Dampier $500,000- Dampier's funder requested a modification to a JVA that would allow them to be included as an explicit third-party beneficiary. As a lawyer, ADS notified Dampier that this provision is illegal.
5. Legis Finance $1,000,000- Tom Stoughton has been an officemate of Tina for 5 years. They proposed this to her directly.
6. DE Shaw $25,000,000- As noted above, Tina procured this and sent it to ADS. ADS rejected the terms as being non-market and potentially illegal.
7. Legalist introduction for Cooper Masterman – As noted above, ADS provided no IP nor competed with ACP. There are no fees to be paid.
8. Simply Convert Dashboard- This is an external program that is used as a CRM. I don't understand how ACP would have any ownership or competition with this.
   a. Simply Convert has a claims portal that is the exclusive CRM of all BLG co-counsels.
   b. SC provides data hosting services that ACP does not.
   c.
xix.  Data Security and Regulatory Risks
1. This reads like a straight extortion attempt. There is a binding NDA that requires ACP to store all of this information in the strictest of confidences. Demanding money to avoid exposure violates this requirement.

4. ACP vs Tina
   a. 10.5.2022 – Bullock Ward Mason is formed
   b. 1.31.2023 – BLG signed an NDA with BBE
   c. 2.23.2023- Amended and restated loan with BBE

d. 2023 – Tina created the Jotform intake that has the specific questions still used
e. 10.18.2023-
f. 11.13.2023- BLG gets a client intake for Nathan Graves with all current questions
g. 3.1.2024- BLG questionnaire in current form
h. 4.28.2024 – Current intake questionnaire from Brought Partners
i. 5.22.2024 – BLG and ACP sign a mutual NDA
j. 9.27.2024- ADS signs a JVA with BLG to act as settlement counsel
k. 10.18.2024 – Bullock Ward Mason finalizes separation
l. 10.25.2024 – BBE does a restated note after split
m. 11.14.2024- ADS attends mediation with BLG in Philadelphia
n. 12.18.2024 – BLG enters into an agreement with Milestone